J-E02009-15

2015 PA Super 255

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.R.D. AND T.M.D., MINOR CHILDREN | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.C., NATURAL FATHER | : | No. 1728 MDA 2013 |

Appeal from the Decree August 19, 2013
In the Court of Common Pleas of Lycoming County
Orphans' Court at No(s): 6365

BEFORE: GANTMAN, P.J., BENDER, P.J.E., PANELLA, J., DONOHUE, J.,
SHOGAN, J., ALLEN, J., LAZARUS, J., MUNDY, J., and STABILE, J.

OPINION BY GANTMAN, P.J.:                    **FILED DECEMBER 08, 2015**

Appellant, M.C. ("Father") appeals from the decree entered in the Lycoming County Orphans' court, which granted the petition of M.D. ("Mother") and Maternal Grandfather to terminate Father's parental rights to M.R.D. and T.M.D. ("Children"). Father asks us to determine whether the Orphans' court erred when it granted the termination petition because termination of his parental rights does not serve the best interests of Children. We hold the Orphans' court correctly terminated Father's parental rights to Children, under the facts and circumstances of this case; Maternal Grandfather qualified as a "good cause" candidate to adopt Children and his proposed adoption of Children is both legally feasible and realistically foreseeable; thus, termination of Father's parental rights serves the best interests of Children. Accordingly, we affirm.

To relate the relevant facts and procedural history of this case, we

begin with the Orphans' court findings of fact set forth in its opinion as follows:

*Finding of Facts*

1.   [Children] were born [in October 2004], in Lycoming County, Pennsylvania.   [Children] currently reside with their [M]other [in] Lycoming County, Pennsylvania. [C]hildren's mother is [M.D.], who was born [in May 1979].   Mother is currently unmarried.   [C]hildren's [M]aternal [G]randfather…currently resides [in] South Williamsport, Lycoming County, Pennsylvania.   Maternal [G]randfather is currently married to…maternal grandmother.

2.   [Children's] father is [M.C.].   Father resides [in] Pierre, South Dakota.  Mother and Father met while Mother was teaching in South Dakota in 2002.

3.   Mother and Father lived together in South Dakota until Mother returned to Pennsylvania in October 2003.

4.   Father moved to Pennsylvania briefly in January 2004, but returned to South Dakota.

5.   After Father left Pennsylvania, Mother learned of her pregnancy.  Mother informed Father of her pregnancy and Mother and Father spoke infrequently throughout the pregnancy.

6.   Mother moved into the home of [M]aternal [G]randfather during her pregnancy.

7.   The majority of Father's family resides in South Dakota.

8.   The majority of Mother's family resides in Pennsylvania.

9.   In October of 2004, Father traveled to Pennsylvania following [C]hildren's birth for a few days.

10.   Father is not on [C]hildren's birth certificate.

- 2 -

11. In December of 2004, Father traveled to Pennsylvania to visit [C]hildren. Father stayed in Maternal Grandfather's home.

12. In January of 2006, Father traveled to Pennsylvania for a visit. Mother planned special experiences between Father and [C]hildren such as their first haircuts, a professional photo session and shopping trips.

13. In February 2006, Mother discussed with Father [Mother] and [C]hildren traveling to South Dakota to meet [C]hildren's extended family. Father was not supportive.

14. In approximately August of 2006, Mother moved from [M]aternal [G]randfather's home to…Jersey Shore, Pennsylvania. The home was owned by Maternal Grandfather and had previously been a rental property. Maternal Grandfather charged Mother no rent for the home.

15. Father was aware of the address [change] as evidenced by an envelope sent by Father to [Jersey Shore, Pennsylvania] in December of 2006. The envelope was entered into evidence.

16. In August of 2006, Mother began working at Williamsport Area School District.

17. The parties' communication became extremely infrequent.

18. Mother received the last written correspondence sent by Father in January of 2007.

19. In the Spring of 2007, Father contacted Mother. Mother felt Father was drunk during this phone call.

20. Mother changed her phone number to an unlisted number following the Spring 2007 phone call. Mother's address remained unchanged until 2010. Maternal Grandfather's address remained the same from the time of [C]hildren's birth until the hearing on August 13, 2013.

21. At the time of the hearing on the Petition for Termination of parental rights, Father had not seen [Children] since January 2006.

22. At the time of the hearing on the Petition for Termination of parental rights, Father had not sent [Children] written correspondence since January 2007.

23. Father did not send cards or gifts to [C]hildren because he was unsure if Mother's address had changed.

24. Father contacted an attorney in 2009 to discuss custody.

25. Father knows how to contact Mother's parents in Pennsylvania. Father had no contact with Mother's parents.

26. Father has provided little support for [C]hildren during the first few years of their lives. Father sent Mother money on one occasion and bought gifts on his January 2006 visit. Father had provided no further support.

27. Father has sent little more correspondence than six greeting cards to [C]hildren throughout their lives.

28. In…November of 2012, Father called and left a voicemail at Mother's place of employment, Williamsport Area School District. Mother did not return Father's phone call.

29. Father filed for custody in December 2012, Mother received Notice of proceeding in January 2013.

30. Mother [and Maternal Grandfather] filed [a] Petition for Termination of [Father's] Parental Rights on [January 29, 2013 and an amended petition on February 28, 2013].

31. [Children] did not learn of the existence of their biological father until the summer of 2013.

32. Mother informed [C]hildren of the existence of their biological father due to the pending termination hearing and the fact that [C]hildren would be speaking with the

Guardian *Ad Litem* regarding [F]ather.

33. When Mother, or the Guardian *Ad Litem*, discussed Father with the children, they listed either "Pa Pa," Maternal Grandfather[,] or "God" as their father.

34. [C]hildren have no bond with Father.

35. Father's intention is to become more involved with [C]hildren and form a relationship with [C]hildren.

(Orphans' Court Opinion, filed August 19, 2013, at 5-9). The Orphans' court held a termination hearing on August 13, 2013. As a result of the hearing and arguments presented, the Orphans' court concluded:

> [T]his Court must first address and evaluate the proposed adoption of the children by Maternal Grandfather while Mother retains her parental rights. Mother has demonstrated good cause for an adoption by Maternal Grandfather in this instance.
>
> Mother and Maternal Grandfather have shared parental duties of the minor children since their birth [in 2004]. Immediately after [M.R.D.'s] birth, he was transported to a separate hospital from Mother and [[T.M.D.]. Maternal Grandfather traveled to and from each hospital to see the boys. After leaving the hospital the boys and Mother returned to [Maternal] Grandfather's home where he took on a regular role in diapering and feeding. Grandfather regularly held [T.M.D.] to help him fall asleep. Maternal Grandfather got up with [C]hildren in the night.
>
> [Children] lived at Maternal Grandfather's home until they were 22 months old. Thereafter, Maternal Grandfather provided housing for the boys while they lived in Jersey Shore. Maternal Grandfather continues to provide significantly for the boys through groceries and other assistance. Maternal Grandfather has requested certain work hours around his need to be available to pick the boys up after school. [Maternal] Grandfather has picked the boys up regularly from daycare, preschool, kindergarten and first grade. [Maternal] Grandfather

knows the boys' interests and participates in their activities. This involvement in the boys' lives has continued and developed at the boys' various stages from pretending to be pirates to learning football skills. [Maternal] Grandfather stated that the boys depend on him.

[Maternal] Grandfather has played a regular role in decision making in the boys' lives. [Maternal] Grandfather attended school conferences and has dealt with discipline issues as a team with Mother. [Maternal] Grandfather had traveled to doctor's appointment[s] with Mother. [Maternal] Grandfather and Mother have co-parented [M.R.D. and T.M.D.]. [Maternal] Grandfather vacations with the boys. [Maternal] Grandfather assists in homework. [Maternal] Grandfather has disciplined the boys. [Maternal] Grandfather attends school functions with the boys. [Maternal] Grandfather has taken the boys to his place of employment and regularly along on jobs. [Maternal] Grandfather testified that he "raised" his other children the same way he is raising [M.R.D. and T.M.D.]. [Maternal] Grandfather has been [M.R.D. and T.M.D.]'s *de facto* father since birth. It is clear from the testimony presented that Maternal Grandfather and Mother together have raised the boys. [Maternal] Grandfather's role in [C]hildren's lives extends far beyond the role of a typical grandparent. [Maternal] Grandfather is clearly one half of the parental unit that has raised [C]hildren. [Maternal] Grandfather's authority, control and influence over [C]hildren is equal to that of Mother.

Maternal Grandfather has been in the role of parent for [C]hildren on a nearly daily basis and will continue to do [so]. Maternal Grandfather expressed concern of providing for the boys' education and financial future. Grandfather's present job as an instructor at Pennsylvania College of Technology will provide free tuition for the boys if they are legally adopted by [Maternal] Grandfather.

Mother has demonstrated good cause as to why this adoption should be allowed to proceed. Adoption by Maternal Grandfather in this case would simpl[y] memorialize that *status quo* of [M.R.D. and T.M.D.]'s lives. Maternal Grandfather will continue to raise them as his

[C]hildren.

* * *

The [c]ourt finds as of the date of the Petition to Involuntar[ily] Terminate his parental rights, Father has failed to perform his parental duties for a period of time in excess of six (6) months and has evidenced a settled purpose of relinquishing his parental claim. Father failed to contact his [C]hildren or their Mother from the spring of 2007 until November of 2012. In November 2012, Father left a voice message for Mother at her place of employment. Father reasoned he did not know any other means to contact Mother. The message did not mention either of his sons. Mother had been employed by the Williamsport Area School District since 2006 and Mother had previously told Father of that employment. Mother was a teacher when Father met her. Mother's parents continued to reside at the same address where Father had visited with [C]hildren. Father had consulted an attorney regarding his custodial rights in 2009. Father's testimony that he had no way of contacting Mother is not credible. Father's filing of a Petition for Custody in the 6-month period prior to the filing for Termination alone is not sufficient especially since this [c]ourt must consider the entire background of the case. Father has failed to exert himself to maintain a role in his [C]hildren's lives. From the [s]pring of 2007, to the date of the filing of the Petition in February 2013, almost six years of the 8-year-old [C]hildren's [lives], Father has failed to show even a passive interest in [Children]. Father's intent to become more involved in [C]hildren's lives is not sufficient. A parent has an affirmative duty to be part of [his] child's life.

* * *

In the present case, Father does not have a bond with [C]hildren. The only father figure that [C]hildren have is Maternal Grandfather. There was no testimony from any party demonstrating any bond between Father and [Children]. There was no evidence presented that [C]hildren had any recollection of or even knowledge of Father until the summer of 2013. It is clear that Father

has no bond with [Children].  Further, termination of his rights would not destroy an existing necessary and beneficial relationship as there currently [is] no relationship between Father and [C]hildren.

*Conclusions of Law*

1. The [c]ourt finds that [Mother] and [Maternal Grandfather] have established by clear and convincing evidence that [Father's] parental rights should be involuntarily terminated pursuant to 23 Pa.C.S. § 2511 (a)(1).

2. The [c]ourt finds that [Mother] and [Maternal Grandfather] have established by clear and convincing evidence that the developmental, physical and emotional needs and welfare of [M.R.D.] and [T.M.D.] will best be served by termination of [Father's] parental rights.

(***Id.*** at 3-5, 10-11, 12-13).  As a result, the Orphans' court entered a decree that terminated Father's parental rights to Children.  Father timely filed a notice of appeal on September 18, 2013, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i). Initially, a three-judge panel reversed the Orphans' court decision, with one dissent.  On April 1, 2015, this Court granted *en banc* reargument, which followed on June 30, 2015.

Father raises three issues for review:

WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT [MOTHER AND MATERNAL GRANDFATHER] SHOWED GOOD CAUSE UNDER SECTION 2901 OF THE ADOPTION ACT TO PROCEED WITH THE ANTICIPATED ADOPTION OF CHILDREN WAS CONTRARY TO THE EVIDENCE AND CONTRARY TO CONTROLLING PRECEDENT AND LAW, SPECIFICALLY:

    1.  WHETHER THE TRIAL COURT ERRED IN

TERMINATING THE PARENTAL RIGHTS OF [FATHER] WHEN THE PROPOSED ADOPTION BY MATERNAL GRANDFATHER WOULD NOT CREATE A NEW, GENUINE, PARENT-CHILD RELATIONSHIP AND FOSTER THE CREATION OF A NEW FAMILY UNIT;

2. WHETHER THE TRIAL COURT ERRED IN DETERMINING THAT THE ANTICIPATED ADOPTION OF THE CHILDREN BY MATERNAL GRANDFATHER WOULD BE IN THE CHILDREN'S BEST INTERESTS.

WHETHER THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF [FATHER] PURSUANT TO 23 PA.C.S.A. [§] 2511(A)(1) AND IN FINDING THAT [FATHER] EVIDENCED A SETTLED PURPOSE OF RELINQUISHING HIS PARENTAL CLAIMS AND FAILED TO PERFORM HIS PARENTAL DUTIES.

WHETHER THE TRIAL COURT ERRED IN TERMINATING THE PARENTAL RIGHTS OF [FATHER] WHEN THERE WAS INSUFFICIENT EVIDENCE THAT THE BEST INTERESTS OF CHILDREN WOULD BE SERVED BY TERMINATION, PURSUANT TO 23 PA.C.S.A. [§] 2511(B).

(Father's Brief at 2-3).

In his issues combined, Father begins with a challenge to the proposed adoption of Children by Maternal Grandfather. Specifically, Father analogizes to several other county cases where the Orphans' court refused for various reasons to terminate parental rights in view of the proposed adoption. Father argues this case is comparable because Mother's entire family, not just Maternal Grandfather, took shifts caring for Children. Father claims Maternal Grandfather's flexible work schedule allows him to help Mother more often as needed in a manner typical of a grandparent of twins. To emphasize Maternal Grandfather's role as that of a typical grandparent

Father also claims Maternal Grandfather is more relaxed about Children's bedtime. Father acknowledges Mother and Children lived with Maternal Grandfather for the first two years of Children's lives. Nevertheless, Father asserts Mother then moved into her current residence and is financially self-supporting. Father avers Maternal Grandfather's contributions, whether characterized as "gifts" or "financial support," are all just to help "pick up the slack." Father maintains Maternal Grandfather's participation in Children's school activities are merely as an "involved grandparent" rather than as a parent for Children. Father insists the testimony about joint vacations is just another example of Maternal Grandfather's exaggerated involvement in Children's lives. Father also argues that Maternal Grandfather ranks a mere third in Children's concept of a "father," after God and Jesus.

Father repeatedly directs our attention to Mother's and Maternal Grandfather's testimony that they do not intend to live in the same house to raise Children. Father submits the legislature intended "an intact family unit" to evolve from a proposed third-party adoption, *i.e.*, a "new parent-child relationship" that would protect the integrity and stability of a new family unit. Father relies on two cases involving proposed adoptions by a stepparent, which were defeated by separation and the contemplation of divorce between the natural parent and the stepparent.[1] Father reasons the proposed adoption in this case is as impermissible as it was in those cases,

---

[1] *See In re Adoption of L.J.B.*, 610 Pa. 213, 18 A.3d 1098 (2011) and *In re Adoption of J.D.S.*, 763 A.2d 867 (Pa.Super. 2000).

because Mother and Maternal Grandfather will not be living together as an "intact family." Father advocates that Mother and Maternal Grandfather must live in the same household for the proposed adoption to succeed legally. Father again emphasizes that Maternal Grandfather's involvement with Children is no more than a grandparent who lets his grandchildren stay up past their bedtime, unlike a parent who ensures a regular or strict bedtime. Father insists the proposed adoption serves no purpose other than to cut Father and his family out of Children's lives, for fear of adverse effect, when the proper procedure would be to address Children's contact with Father through custody proceedings.

According to Father, the only reason Mother and Maternal Grandfather sought involuntary termination of Father's parental rights was to get even with Father for seeking custody of Children after so many years. But for the custody action, Father contends the adoption would not have been proposed. Father also states Maternal Grandfather's relationship with Children "will not change" even if the court denied termination of Father's parental rights; Maternal Grandfather still plans to include Children in his will regardless of the outcome of this case, so adoption will not alter their ability to inherit from him. What will change, Father says, is Children's ability to inherit from Father or his family, if the proposed adoption occurs. Father submits he will no longer be available for child support or inheritance or any other resource for Children. Father assumes terminating his parental rights to allow

Maternal Grandfather to adopt Children will not serve Children's best interests because no one has considered the "stigma of this mix of roles," or whether Mother might marry and if Maternal Grandfather would step aside to allow Mother's new spouse to adopt. Father complains these realities of the proposed adoption were not discussed, which is "simply more evidence that this plan for adoption was created solely as a means to get Father out of the picture." (*Id.* at 28-9).

Next, Father claims he tried to contact Children, but Mother changed her telephone number in 2007, so he could no longer reach her. Father simply assumed Mother also changed her residence after she changed her telephone number. Father argues he met with an attorney in 2009, but was told his chances at custody were poor, so he did nothing to pursue custody at that time. Father acknowledges he had contact information for Mother's parents, but he believed they would not have helped him reach Mother. Father asserts he was "finally able" to track down Mother in November 2012, at work and left a message but received no response. Given Mother's alleged obstacles and attempts to avoid contact, Father concludes the statutory requirements, under 23 Pa.C.S.A. § 2511(a), were not met. Likewise, Father takes issue with the court's conclusion that Father is a stranger to Children for purposes of Section 2511(b). Although he does not dispute the court's conclusion, Father says he has no plans to uproot Children at this time; he just wants to develop a relationship with them.

Father claims the court simply eliminated the additional emotional and financial support he and his family could give Children, when it terminated his parental rights. For all these reasons, Father concludes the proposed adoption is contrary to statute, he had no settled purpose to relinquish his parental rights, and termination of his parental rights is not in the best interests of Children. We disagree with Father's contentions.

Initially, we observe:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' [c]ourt sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of that discretion.

*In re E.M.I.*, 57 A.3d 1278, 1284 (Pa.Super. 2012) (quoting *In re A.J.B.*, 797 A.2d 264, 266 (Pa.Super. 2002)).

> In cases involving termination of parental rights, our scope of review is broad. All of the evidence, as well as the trial court's factual and legal determinations, are to be considered. However, our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child. We have always been deferential to the trial court as the fact finder, as the determiner of the credibility of witnesses, and as the sole and final arbiter of all conflicts in the evidence. Moreover, this Court will affirm a termination of parental rights if competent evidence supports the trial court's findings, even if the record could support an opposite result.

*In re S.D.T., Jr.*, 934 A.2d 703, 705-06 (Pa.Super. 2007), *appeal denied*, 597 Pa. 68, 950 A.2d 270 (2008) (citations omitted). "The burden of proof

- 13 -

in a termination case is on the petitioning party, who must establish valid grounds for termination by clear and convincing evidence." ***In re E.M.I., supra*** (citing ***In re J.L.C.***, 837 A.2d 1247, 1251 (Pa.Super. 2003)).

Section 2512 governs who may bring a petition to terminate parental rights and what the petition must contain and provides as follows:

**§ 2512.  Petition for involuntary termination**

**(a)   Who may file.**—A petition to terminate parental rights with respect to a child under the age of 18 years may be filed by any of the following:

(1)   Either parent when termination is sought with respect to the other parent.

(2)   An agency.

(3)   The individual having custody or standing in *loco parentis* to the child and who has filed a report of intention to adopt required by section 2531 (relating to report of intention to adopt).

(4)   An attorney representing a child or a guardian ad litem representing a child who has been adjudicated dependent under 42 Pa.C.S.A § 6341(c) (relating to adjudication).

**(b)   Contents.**—The petition shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights.  The petition filed under this section shall also contain an averment that the petitioner will assume custody of the child until such time as the child is adopted.  If the petitioner is an agency it shall not be required to aver that an adoption is presently contemplated [or] that a person with a present intention to adopt exists.

\*     \*     \*

23 Pa.C.S.A. § 2512(a)-(b).  "If the petitioner is not an agency, then the

- 14 -

petition must include 'an averment that an adoption is presently contemplated or that a person with a present intention to adopt exists.'" *In re E.M.I., supra* at 1286 (quoting *In re Adoption of J.F.D.*, 782 A.2d 564, 567 (Pa.Super. 2001)).  As a general rule, however, the biological parent who files a petition to terminate the parental rights of the other biological parent, with the intent to retain custody or physical care of the child, does not have to file an accompanying report of intention to adopt.  *Id.* at 1286. *See also* 23 Pa.C.S.A. § 2531(c) (stating: "No report shall be required when the child is the child, grandchild, stepchild, brother or sister of the whole or half blood, or niece or nephew by blood, marriage or adoption of the person receiving or retaining custody or physical care").

A termination petition of one biological parent against the other, per Section 2512(a)(1), is cognizable only if the averred adoption is foreseeable. 23 Pa.C.S.A. § 2512(b); *In re E.M.I., supra* at 1286.  *See also In re B.E.*, 474 Pa. 139, 142, 377 A.2d 153, 154 (1977) (stating plan for adoption is required, when one biological parent seeks involuntary termination of parental rights of other biological parent).  Although a petition might satisfy the statutory requirements for termination of parental rights, a court still cannot grant the petition without a corresponding plan for adoption of the child.  *In re Adoption of L.J.B., supra* at 228, 18 A.3d at 1107 (reversing involuntary termination of mother's parental rights, where termination decree was entered to make way for stepmother's adoption of child, in light

of new evidence that stepmother no longer wanted to adopt child). A contemplated adoption is required in this context because "the purpose of involuntary termination of parental rights is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child." *Id.* at 229-30, 18 A.3d at 1108.

Significantly, "Any individual may become an adopting parent." 23 Pa.C.S.A. § 2312. The "any individual" language permits a non-spouse to adopt even where one of the natural parents continues to retain custody, upon "cause shown." *In re Adoption of R.B.F.*, 569 Pa. 269, 280-81, 803 A.2d 1195, 1202 (2002); 23 Pa.C.S.A. § 2901. A non-spouse adoptive nominee can be a child's maternal grandfather. *In re Adoption of J.M.*, 991 A.2d 321, 326 (Pa.Super. 2010). The purpose of the "cause shown" approach, borrowed from Section 2901, is consistent with legal precedent which requires the court to analyze the integrity of the "proposed adoption" and if it is likely to happen. *See In re T.R.*, 502 Pa. 165, 169 n.10, 465 A.2d 642, 644 n.10 (1983) (insisting court should actually consider adoptive candidate's intent to adopt, and not merely accept adoption averment on its face, to determine if petitioner(s) genuinely seek termination "solely as an aid to adoption"). *See also In re Adoption of L.J.B., supra* at 230, 18 A.3d at 1108 (stating court should consider, and not merely accept on its face, averment of intent to adopt, to ascertain that termination is sought as

aid to adoption and formation of new parent-child relationship).

Assuming the termination pleading itself satisfies the statutory prerequisites for a hearing, the Orphans' court applies the two-part test for termination of parental rights under Section 2511 of the Adoption Act. ***See*** 23 Pa.C.S.A. § 2511. The initial focus is on the conduct of the parent whose rights are at issue. ***In re C.L.G.***, 956 A.2d 999, 1004 (Pa.Super. 2008) (*en banc*). Termination under Section 2511(a)(1) involves the following:

> To satisfy the requirements of [S]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child **and** refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child **or** fails to perform parental duties.
>
> Once the evidence establishes a failure to perform parental duties **or** a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his…conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***In re Z.S.W.***, 946 A.2d 726, 730 (Pa.Super. 2008) (internal emphasis added). Regarding the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his… parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M., supra* at 855 (citations omitted).

"The biological relationship of parent and child does not vest in the parents a property right to the custody of the child." *In re E.F.V.*, 461 A.2d 1263, 1267 (1983). Instead, a parent-child relationship is a status, "and one in which the state has an interest to protect the best interest of the child." *Id.* Maintaining a parent-child relationship requires a continued interest in the child and a genuine effort to maintain communication and association with the child. *In re E.M.*, 908 A.2d 297, 305-06 (Pa.Super. 2006). *See also In Re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 582 Pa. 718, 872 A.2d 1200 (2005) (determining parental duty encompasses more than just financial obligation; relationship requires parent to exert himself to take and maintain place of importance in child's life and to act affirmatively with good faith interest and effort, even in difficult circumstances).

> A parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise "reasonable firmness" in resisting obstacles placed in the path of maintaining the parent-child relationship. This [C]ourt has repeatedly recognized that parental rights are not preserved…by

> waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs.

*In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), *appeal denied*, 580 Pa. 687, 859 A.2d 767 (2004). All explanations considered, if the parent makes reasonable attempts to overcome obstacles created by the party seeking termination, then the parent's failure to pursue legal action more promptly will not alone justify termination. *In re Adoption of L.J.B., supra* at 253-54, 18 A.3d at 1122.

The second prong of the termination test centers on the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010); 23 Pa.C.S.A. § 2511(b). "A proper Section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa.Super. 2008), *appeal denied*, 601 Pa. 684, 970 A.2d 1148 (2009). Under Section 2511(b), the court should examine intangibles such as "love, comfort, security, and stability" when determining the needs and welfare of the child. *Id.*

In the circumstance of one biological parent seeking to terminate the parental rights of the responding parent, prevailing case law indicates that, at the termination hearing, the petitioning parent must also demonstrate the planned adoption is in the child's best interests, before the court will terminate the parental rights of the responding parent. *See In re*

*Adoption of L.J.B., supra* at 232, 18 A.3d at 1110-11 (implying no gain to child or society can be achieved by terminating one parent's rights to permit adoption by another person who is unwilling or unqualified to adopt). Thus, as part of its Section 2511(b) analysis of the needs and welfare of the child in this particular situation, the court evaluates the evidence pertaining to the "proposed adoption" that was averred in the termination petition. *See generally id.*

With regard to whether cohabitation is required for the proposed adoption, the case of *In Re Adoption of J.M.* is both precedential and instructive. The mother and the father in *J.M.* were the unmarried, natural parents of the child. Given the father's unmitigated parental inaction for two years, the mother and the maternal grandfather took primary care of the child. The mother and the maternal grandfather filed a private petition pursuant to 23 Pa.C.S.A § 2511 seeking involuntary termination of the father's parental rights. At the evidentiary hearing, Mother testified that the child does not know the father and fears him as the child would fear any other stranger. The father's total interaction with the child consisted of one birthday card and a single one-hour visit with the child that occurred in a Wal-Mart parking lot. Further, the father did not contact the mother to inquire about the child's needs and welfare. The court found the mother had established statutory grounds for involuntary termination of the father's parental rights under subsection 2511(a)(1).

The maternal grandfather testified that he interacted with the child for two to four hours every day and more during the weekends, provided financially for the child, and sincerely desired to fill the void created by the father's absence. Additionally, the trial court acknowledged no bond existed between the father and the child. Nevertheless, the trial court did not find termination was in the child's best interest pursuant to subsection 2511(b), because "no new family unit would result given that Mother and Maternal Grandfather have maintained completely separate households since the child's birth and Maternal Grandfather has never maintained physical custody of Child." *In re Adoption of J.M., supra* at 325-26 (reciting trial court's rationale in which court considered cohabitation as absolutely necessary to proposed adoption).

On appeal, this Court held the mother had proved by clear and convincing evidence that involuntary termination of the father's parental rights was warranted under Section 2511(a) and that severing the father's parental rights would best serve the child's developmental, physical, and emotional needs and welfare under Section 2511(b). This Court explained:

> Interspersed throughout its needs and welfare analysis, the trial court made factual findings that the adoption contemplated by Maternal Grandfather was not in J.M.'s best interest because it would not create a traditional, nuclear family. Essentially, the trial court considered cohabitation to be the *sine qua non* of the family unit. Specifically, the court reasoned, no new family unit would result given that [Mother and Maternal Grandfather] have maintained completely separate households since the child's birth and [Maternal Grandfather] has never

- 21 -

> maintained physical custody of [J.M.]. The trial court continued, although Mother seeks to fashion a formal parental relationship between Maternal Grandfather and J.M., she did not present evidence that a formal relationship was in the child's best interest or that J.M. considered Maternal Grandfather to be her father rather than her grandfather.

*Id.* at 325-26. Our Court rejected the notion that cohabitation or having to live under the same roof is a necessary component for creation of the "new family unit" for purposes of termination of parental rights and adoption. *Id.* Instead, this Court reversed the trial court's outright refusal to terminate the father's parental rights and remanded the case for the trial court to permit the mother to show "cause" for the proposed adoption to proceed. *Id.* at 327.

Instantly, the Orphans' court found that Mother and Maternal Grandfather had established ample evidence to support involuntary termination of Father's parental rights under Sections 2511(a) and (b), **and** showed good cause to proceed with Maternal Grandfather's proposed adoption of Children. In eight years, Father visited Children only two or three times, and he refused to allow them to come to his home or meet his extended family. Father claimed he had no way of contacting Mother or Children, although he conceded he eventually located Mother in 2012 by computer and her email address had remained the same throughout the relevant time. To excuse his lack of effort at initiating or maintaining contact with Children, Father said he was "not a writer," "not an email

person," and "not a computer person." (**See** N.T., 8/13/13—**p.m.**, at 67, 69, 72; R.R. at 106a-107a.) Father asserted he gave Mother some child support, but he could not recall when or how much. (**Id.** at 62-63; R.R. at 104a-105a). Father further conceded that Mother had tried to develop a relationship between Children and Father and his family for several years after Children's birth. (**Id.** at 71; R.R. at 107a). Father also knew where Mother's parents live, and he had a viable address for Mother until 2010. (**Id.** at 74; R.R. at 107a). Nevertheless, Father insisted Mother cut **him** off because he could not talk to her or see Children or find out how they were. (**Id.** at 76-77; R.R. at 108a). The Orphans' court found Father's testimony incredible.

In any event, Father had an affirmative duty to take part in Children's lives, which included overcoming any perceived obstacles to fulfilling that duty. **See In re C.M.S., supra**. When Father filed his petition for custody in 2012, he had not contacted or visited or supported Children in any manner for almost six years, which is well in excess of the six-month timeframe under Section 2511(a)(1). Therefore, Father evidenced both a settled purpose of relinquishing his parental claim to Children **and** a failure to perform his parental duties. **See In re Z.S.W., supra**.

Further, the evidence demonstrated Father and Children are complete strangers, with no parent-child bond. Children had no recollection or even real knowledge of Father until 2013, and do not identify him as their father.

Instead, Maternal Grandfather consistently provided Children with physical, emotional, and financial support. After deliberately eschewing all of his parental responsibilities for almost six years, Father sought to insert himself into Children's lives, based solely on a personal sense of entitlement.

As part of the subsection (b) analysis, the record shows Maternal Grandfather contemplated adopting Children for years but saw no immediate need to do so, given Father's absolute desertion. Maternal Grandfather emphasized Father had been absent from the Children's lives for a majority of their eight years. Only when Father filed his unforeseen petition for custody of Children, did Mother and Maternal Grandfather need court intervention to protect Children. For eight years, Mother and Maternal Grandfather raised Children without Father's assistance and regardless of Father's deliberate failure to act. Maternal Grandfather filled the void Father had created. Maternal Grandfather continues to provide for the Children financially and emotionally. Mother and Children lived with Maternal Grandfather for two years after Children's birth. Maternal Grandfather shared parental duties with Mother every day by feeding Children, changing their diapers, picking them up from daycare, and putting them to bed. After Mother and Children moved into a separate residence owned by Maternal Grandfather, he continued his daily involvement with Children and participated in Children's doctor appointments, school conferences, sports and extracurricular activities. Maternal Grandfather testified Mother and

Children have more than half of their meals at his residence. (**See generally** N.T., 8/13/13—**a.m.**, at 69-86; 8/13/13—**p.m.**, at 3-31; R.R. at 69a-86a; 90a-97a.)

The Orphans' court had competent evidence to decide: Maternal Grandfather's involvement exceeds that of a "normal" grandparent; which testimony was credible; and the primary purpose of the petition for involuntary termination of Father's parental rights was to safeguard Children's best interests. **See In re Z.S.W., supra**; **In re S.D.T., Jr., supra**. The Orphans' court sat as the fact-finder in this case, and the court's findings on the credibility of the witnesses and the motivation for their actions have record support. In its Rule 1925(a) opinion, the court wrote:

> Maternal Grandfather testified to adoption contemplated himself years before Father contacted Mother. This testimony was credible. Maternal Grandfather testified that he had not proceeded with adoption earlier because he "didn't see a need." "There was no threat of this happening and then all of a sudden it does…." In the case at hand, termination of parental rights only became necessary once Father contacted Mother in 2012. Maternal [G]randfather, Mother and [Children] acted as a family with little involvement from Father from the time of [Children's] birth [in October 2004]. Father had not contacted Mother from Spring 2007 until December 2012. There were no indications from Father that necessitated Maternal Grandfather and Mother formalizing their family through termination of parental rights and adoption.

(Orphans' Court Opinion, filed October 17, 2013, at 2) (internal citations to the record omitted). In this statement, the Orphans' court made clear it

- 25 -

understood Mother's and Maternal Grandfather's objective in filing their termination petition was to protect Children. The timing of their petition is not dispositive of any retaliatory intent, particularly in light of the Orphans' court's conclusion otherwise. *See In re A.J.B., supra*. As such, the record supports the Orphans' court's conclusion that Mother and Maternal Grandfather satisfied the statutory requirements for termination under Section 2511(a)(1) and (b).

With respect to Father's contention that the proposed adoption will not create a new family unit, we conclude "cohabitation" is not the *sine qua non* of the "new family unit."[2] *See In re Adoption of J.M., supra*. Neither the Adoption Act nor relevant case law defines "new family unit" or "new parent-child relationship" for purposes of a proposed adoption in the present circumstances. Further, this Court has already rejected the inflexible notion that cohabitation is absolutely required for a proposed adoption. In other words, the fact that Mother and Maternal Grandfather live in separate residences, both of which are family-owned residences, does not by itself thwart the proposed adoption plan in this case. *See id.* Such a rigid mindset is alarming in today's world, because that mindset is rooted in the concept of the traditional, nuclear family as consisting of a man and a woman, a relationship formalized through marriage, and cohabitation. To

_____

[2] The language "intact family unit" derives from those cases involving stepparent adoption where the natural parent and the stepparent are divorcing, and the stepparent (adoptive nominee) has separated from the natural parent and no longer wants to adopt.

- 26 -

define "family-unit" this way improperly narrows the purpose of the Adoption Act and blatantly ignores evolving societal norms. Father's reliance on **In re Adoption of L.J.B., supra** is likewise misplaced because the **L.J.B.** case was primarily concerned with the separation and pending divorce between the child's natural father and his wife, the adoptive nominee, who no longer wanted to adopt the child. Because the proposed adoption was in jeopardy, the Supreme Court could not affirm termination of the natural mother's parental rights. The facts of **L.J.B.** differ remarkably from the present case in many respects, and to say the present case is like **L.J.B.** is an unwarranted stretch.

As the Orphans' court did, we also focus on the familial relationship Maternal Grandfather established with Children, instead of the superficial, indefinite externals and speculations Father suggests, such as what if Mother should marry, which are nothing more than mere conjecture. The primary purpose of the Adoption Act is served by securing Children in the parent-child relationship as proposed with Maternal Grandfather, the adoptive nominee. **In re E.M.I., supra**. The record makes clear Maternal Grandfather and Children already enjoy a healthy, deep emotional bond. Maternal Grandfather serves as a *de facto* father to Children. Formal adoption in this case will preserve the stability Children already know and still create a "new" parent-child relationship, because adoption will legalize their respective rights and obligations. This legal authorization is what

establishes the "new" in the existing *de facto* parent-child relationship. Maternal Grandfather testified he both understands and accepts the legal obligations he will have as a parent through the proposed adoption. Therefore, Children will not become "state-created orphans," as Father insinuates.

Based upon the foregoing, we hold the Orphans' court correctly terminated Father's parental rights to Children, under the facts and circumstances of this case; Maternal Grandfather qualified as a "good cause" candidate to adopt Children and his proposed adoption of Children is both legally feasible and realistically foreseeable; thus, termination of Father's parental rights best serves the developmental, physical, and emotional needs and welfare of Children. Accordingly, we affirm.

Decree affirmed.

President Judge Emeritus Bender, Judges Panella, Lazarus, and Mundy join the opinion.

Judge Stabile files a dissenting opinion in which Judges Donohue and Shogan join.

Judge Allen did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/8/2015