J. A09015/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF O.S.G.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| APPEAL OF L.A.W., FATHER | : | |
| | : | No. 1944 MDA 2015 |

Appeal from the Order Entered October 7, 2015,
in the Court of Common Pleas of Cumberland County
Orphans' Court Division at No. 41 Adoptions 2015

BEFORE: FORD ELLIOTT, P.J.E., JENKINS AND PLATT,* JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JULY 08, 2016**

L.A.W. ("Father") appeals from the order entered October 7, 2015, in the Court of Common Pleas of Cumberland County, which terminated Father's parental rights with respect to his minor daughter, O.S.G.W. ("Child"), born in October of 2006. After careful review, we affirm.

This appeal arises from the petition for involuntarily termination of parental rights filed by Child's mother, M.K. ("Mother"), on May 15, 2015.[1] While the details are not clear from the record, it appears that Father and Mother dated until Father was incarcerated ten days after Child's birth. (Notes of testimony, 9/4/15 at 14-15.) By the time Father was released from incarceration ten or eleven months later, Mother had ended her

---

* Retired Senior Judge assigned to the Superior Court.

[1] Mother filed an amended petition for involuntary termination of parental rights on June 24, 2015.

relationship with Father, and was dating her current fiancé, H.M. (*Id.* at 15, 17-18.) In 2011, Mother commenced a custody action against Father, and the parents entered into a stipulated custody agreement, whereby Mother was awarded primary physical and sole legal custody of Child, and Father was awarded partial physical custody when agreed to by the parties. (*Id.* at 11-13; Petitioner's Exhibit 1.) Father never exercised any periods of partial physical custody pursuant to this order, and he has had no contact with Child at all since approximately September of 2007. (Notes of testimony, 9/4/15 at 11.) In March of 2015, Father began sending frequent text messages to Mother via phone and social media, asking to see Child. (*See* Respondent's Exhibit 2 at 9-65.) Father filed a petition to modify the 2011 custody order in April of 2015, shortly before Mother filed her termination petition. (Notes of testimony, 9/4/15 at 96.)

A termination of parental rights hearing was held on September 4, 2015, during which the orphans' court heard the testimony of Mother; her fiancé, H.M.; Father; and Father's wife, A.W. Following the hearing, on October 7, 2015, the orphans' court entered its order terminating Father's parental rights to Child. Father timely filed a notice of appeal on November 5, 2015, along with a concise statement of errors complained of on appeal.

Father now raises the following issues for our review.

> 1. Whether the [orphans'] court erred as a matter of law in finding Mother established by clear

and convincing evidence that Father refused or failed to perform his parental duties for at least the six month[s] immediately preceding the filing of Mother's Petition, particularly in light of Mother's obstructive tactics to prevent Father from being able to perform said parental duties?

2. Whether the [orphans'] court abused its discretion by failing to assign greater weight to Father's actions in the six months immediately preceding the filing of Mother's Petition?

3. Whether the [orphans'] court abused its discretion by failing to assign greater weight to Mother's actions, through the child's life and especially in the six months preceding the filing of Mother's Petition, to prevent Father from performing his parental duties?

Father's brief at 5.

We consider Father's claims mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a).  Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b):  determination of the needs and welfare of the child under the standard of best interests of the child.  One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1) and (b), which provide as follows.

> **(a)  General Rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1)  The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(1). To meet the requirements of this section, "the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties." *In re Z.S.W.*, 946 A.2d 726, 730 (Pa.Super. 2008), citing *In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa.Super. 2006). The court must then consider "the parent's explanation for his or her conduct" and "the post-abandonment contact between parent and child" before moving on to analyze Section 2511(b). *Id.*, quoting *In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998).

This court has explained that a parent does not perform his or her parental duties by displaying a "merely passive interest in the development of the child." *In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004), *appeal denied*, 872 A.2d 1200 (Pa. 2005), quoting *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003), *appeal denied*, 859 A.2d 767 (Pa. 2004). Rather, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *Id.* (citation omitted). Incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. *In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012), discussing *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975).

Instantly, the orphans' court found that Father has failed to perform parental duties for all but the first eleven months of Child's life. (Orphans' court opinion, 12/15/15 at 4.) The court acknowledged that Mother "put up roadblocks" which prevented Father from having contact with Child, but the court determined that Father made no attempts to overcome these roadblocks until October of 2014.[2] (*Id.* at 5.) The court explained that Father did "'everything in his power'" to enforce his right to see Child during

---

[2] At the conclusion of the termination hearing, the orphans' court indicated that Father "began in earnest" attempting to re-establish contact with Child in May of 2014. (Notes of testimony, 9/4/15 at 106.)

the six months immediately preceding the filing of Mother's termination petition on May 15, 2015. (*Id.*, quoting notes of testimony, 9/4/15 at 105-106.) However, the court concluded that Father's belated attempts at parenting Child did not make up for Father's many years of failure. (*Id.* at 6.) In doing so, the court emphasized this court's instruction, that "'[a]lthough it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.'" (*Id.* at 5-6, quoting *B.,N.M.*, 856 A.2d at 855.)

In response, Father presents three interrelated arguments, which we address together. In his first issue, Father contends that Mother failed to present clear and convincing evidence that he demonstrated a settled purpose of relinquishing his parental claim to Child, or that he refused or failed to perform parental duties for at least six months immediately preceding the filing of her termination petition. (Father's brief at 10-27.) Father asserts that he has never evidenced a settled purpose to relinquish his parental claim to Child, and that he has done "everything within his means" to perform parental duties for Child by writing letters, sending text messages, attempting phone calls, and filing a petition to modify custody, *inter alia*. (*Id.* at 12-19.) Father blames Mother for his failure to remain involved in Child's life, indicating that she engaged in "obstructive tactics," such as blocking Father on her phone and on social media. (*Id.* at 19-23.)

Father asserts that he exercised reasonable firmness to overcome the obstacles put in place by Mother. (*Id.* at 24-27.)

In his second issue, Father argues that the orphans' court abused its discretion by failing to assign greater weight to Father's actions in the six months immediately preceding the filing of the termination petition. (*Id.* at 27-30.) Father stresses the court's conclusion that he did everything in his power to see Child during the relevant six months. (*Id.* at 27-28.) In addition, Father insists that he has attempted to perform parental duties "over the lifetime of the child[.]" (*Id.* at 28-29.) Father suggests that the court "misstated and misapplied" the burden of proof in this matter, by placing the onus on Father to prove that his parental rights should not be terminated, instead of requiring Mother to prove that his parental rights should be terminated. (*Id.* at 29-30.)

Finally, Father's third issue is that the orphans' court abused its discretion by failing to assign greater weight to Mother's attempts at preventing Father from exercising parental duties. (*Id.* at 30-32.) Father again insists that it was Mother's obstructive tactics that prevented Father from maintaining a relationship with Child. (*Id.*) Father emphasizes that the orphans' court acknowledged Mother's bad behavior, but proceeded to terminate his parental rights anyway. (*Id.*)

After a thorough review of the proceedings in this matter, we conclude that the orphans' court did not abuse its discretion by terminating Father's

parental rights pursuant Section 2511(a)(1). However, our reasoning differs from that of the orphans' court, as several of the court's findings are not supported by the record. Most notably, our review of record belies the court's assertion that Father did "everything in his power" to perform parental duties for Child in the six months immediately preceding the filing of the termination petition.

During the termination hearing, Mother testified that Father has not had any contact with Child since she was eleven months old. (Notes of testimony, 9/4/15 at 5.) Mother admitted that Father has attempted to visit Child by calling her "a few times," but that "I don't respond to the voice mails or calls." (*Id.* at 10.) Mother initially stated that Father called her "one or two times a year" up until Father filed his custody petition in April of 2015. (*Id.* at 10, 23, 25.) Since then, Father has asked to see Child "numerous times." (*Id.* at 10.) Mother then clarified that she received a voicemail from Father on March 26 or 27, 2015, during which Father stated that "he was coming after us and he would find us and take [Child]." (*Id.* at 19, 33.) Mother believed that this was the only time that Father called her between November of 2014 and May of 2015, and that "it was that phone call that prompted all of this." (*Id.* at 25.) Mother agreed that Father "ramped up" his attempts at contacting her around this time, and that Father also sent her text messages via her cell phone and social media. (*Id.* at 33-37.)

Mother explained that she does not respond to Father's requests to see Child because their discussions always result in an argument, and because "I don't think that it is a safe environment." (*Id.* at 10.) Mother expressed concern relating to Father's history of unstable housing, alcohol use, and drug use. (*Id.* at 14.) Mother believed that Father has been incarcerated repeatedly, and that Father's incarcerations related primarily to drinking, driving under the influence, fighting, and child support.[3] (*Id.* at 14.) Mother acknowledged that Father has paid child support for Child since 2007, but Mother stated that Father was "very frequently" delinquent on his child support payments, and that contempt proceedings were initiated against him on approximately six occasions. (*Id.* at 6-7.) Father was incarcerated "two or three times" as a result of these contempt proceedings, most recently in the fall of 2014. (*Id.* at 8.) At the time of the termination hearing, Father was current on his child support. (*Id.* at 7.)

Father conceded that he has not seen Child since she was eleven months old. (*Id.* at 47.) However, Father testified that he has made numerous attempts to contact Child. Father explained that he was incarcerated from 2007 or 2008 until 2011 or 2012 due to a driving under the influence conviction. (*Id.* at 50.) During that time, Father claimed that

---

[3] A copy of Father criminal record was admitted during the termination hearing. (*See* Petitioner's Exhibit 2.) Father's criminal record contains numerous driving under the influence convictions, as well as convictions for disorderly conduct (engaging in fighting), and public drunkenness, *inter alia*. (*Id.*)

he attempted to maintain a relationship with Child by calling Mother and sending letters and pictures. (*Id.*) According to Father, he attempted to call Mother two or three times a month during his incarceration. (*Id.* at 52.) Father also enlisted the aid of Child's paternal grandmother in order to deliver items to Mother's residence. (*Id.* at 50.)

Concerning the parties' 2011 custody order, Father testified that he asked to see Child "five minutes" after signing the stipulation, but Mother refused to allow him to see Child. (*Id.* at 78-79.) Father claimed that he was not aware that he could seek to modify the custody order, and that he only recently discovered that this was possible. (*Id.* at 87-89, 96.) Father stated that he did not continue to pursue custody pursuant to the 2011 order because he was afraid he would be incarcerated for harassment or stalking. (*Id.* at 94-95.) Despite this setback, Father reported that he continued to call Mother and to send her text messages via his phone and social media.[4] (*Id.* at 57, 89, 92.)

In support of this claim, Father presented the orphans' court with a lengthy exhibit detailing his recent text messages to Mother. (*See* Respondent's Exhibit 2.) Father described this exhibit as "a record of every text message and picture I have sent via Facebook Messenger -- and it looks

---

[4] In addition, Father stated that he attempted to reach out to Mother's parents, and that he paid for a "background search" in order to discover more information about Child. (Notes of testimony, 9/4/15 at 74-76, 79, 81.)

to maybe be text messages [via phone], as well . . . ."[5] (Notes of testimony, 9/4/15 at 59.) The exhibit indicates that Father sent Mother several text messages in May of 2014. (**See** Respondent's Exhibit 2, at 1-6.) Father next sent Mother a single text message in October of 2014. (**Id.** at 9.) Starting on March 26, 2015, and continuing into May of 2015, Father sent Mother frequent text messages and pictures. (**Id.** at 9-65.)

Accordingly, the record indicates that Father made sporadic attempts at contacting Mother from the time Child was eleven months old, in September of 2007, until late March of 2015, when Father began attempting to communicate more frequently. The record does not support the finding of the orphans' court that Father began making a serious effort to re-establish contact with Child as early as May of 2014. The record demonstrates that Father sent Mother a series of text messages in May of 2014, but then did not attempt to contact her again until five months later in October of 2014. Father sent a single text message in October of 2014, and then stopped sending messages for another five months, until March of 2015. Notably, Mother's petition to terminate Father's parental rights was filed on May 15, 2015. By the time Father began sending regular text messages to Mother,

---

[5] Father later indicated that he sent additional text messages to Mother prior to 2015, but that he was unable to print off those messages because they were sent from a different phone, and "the phone that they were on just shut off." (Notes of testimony, 9/4/15 at 71.)

the critical six-month period was already more than two-thirds of the way over.

Further, even after Father began sending regular text messages to Mother in late March of 2015, it is clear that Father was not doing "everything in his power" to enforce his right to see Child, as determined by the orphans' court. This is especially true given Father's failure to perform parental duties for the preceding seven and a half years. While Father is correct that Mother created an obstacle by refusing to allow him to visit with Child, Father initially made no attempt to overcome this obstacle. Instead, Father continued to send text messages that he knew, or should have known, would have no chance of success. While Father finally made an effort to overcome the obstacle created by Mother by filing a petition to modify custody in April of 2015, Father's petition was simply too little, too late. We conclude that Mother presented clear and convincing evidence that Father refused or failed to perform parental duties for the six months immediately preceding the filing of her termination petition, pursuant to Section 2511(a)(1).

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b).[6] We have discussed our analysis under Section 2511(b) as follows.

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010) (citations omitted).

Here, the orphans' court found that there is "absolutely no question" that terminating Father's parental rights will serve the needs and welfare of Child. (Orphans' court opinion, 12/15/15 at 6.) The court emphasized that Child has no relationship with Father, and instead considers Mother's fiancé, H.M., to be her father. (*Id.*) We agree.

---

[6] While Father does not discuss Section 2511(b) in the argument section of his brief, we will nonetheless consider this issue. *See In re C.L.G.*, 956 A.2d 999, 1010 (Pa.Super. 2008) (*en banc*) (considering § 2511(b) despite the appellant's failure to challenge the trial court's analysis).

During the termination hearing, Mother testified that she has been in a relationship with H.M. since February of 2007. (Notes of testimony, 9/4/15 at 17-18.) H.M. has assisted Mother in raising Child since Child was six months old. (*Id.* at 17.) Child knows H.M. as her father, and she refers to him as "dad." (*Id.* at 17-18.) Thus, the record confirms that Child has no relationship with Father. It is clear that Child's needs and welfare will best be served by terminating Father's parental rights, so that Child can be adopted by H.M.[7]

Accordingly, because we conclude that the orphans' court did not abuse its discretion by terminating Father's parental rights pursuant to Sections 2511(a)(1) and (b), we affirm the order of the orphans' court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/8/2016

---

[7] We note that the orphans' court was only permitted to terminate Father's parental rights if it found that an adoption of Child was anticipated. *In re E.M.I.*, 57 A.3d 1278, 1285 (Pa.Super. 2012); 23 Pa.C.S.A. § 2512(b). Generally, an individual may not adopt the child of a non-spouse, unless that non-spouse relinquishes his or her parental rights, or unless the individual and the non-spouse are able to show cause pursuant to 23 Pa.C.S.A. § 2901. *In re Adoption of R.B.F.*, 803 A.2d 1195, 1199-1202 (Pa. 2002); *In re Adoption of M.R.D.*, 128 A.3d 1249, 1260 (Pa.Super. 2015), *appeal granted*, 133 A.3d 293 (Pa. 2015). Father does not challenge the feasibility of H.M.'s proposed adoption of Child, so we do not address it here.