J-S50017-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: E.D.S., A MINOR

APPEAL OF: N.M.S., MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2218 MDA 2015

Appeal from the Order dated November 18, 2015,
in the Court of Common Pleas of Cumberland County, Orphans'
Court, at No: 19 Adoptions 2015

IN RE: ADOPTION OF: A.M.S., A MINOR

APPEAL OF: N.M.S., MOTHER

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 2219 MDA 2015

Appeal from the Order dated November 18, 2015,
in the Court of Common Pleas of Cumberland County, Orphans'
Court, at No: 20 Adoptions 2015

BEFORE:  MUNDY, STABILE, and FITZGERALD*, JJ.

MEMORANDUM BY STABILE, J.:                                    **FILED JULY 11, 2016**

Appellant, N.M.S. (Mother), appeals from the November 18, 2015

decree involuntarily terminating her parental rights to her legally adopted

sons, E.D.S., born in July 2000, and A.M.S., born in May 1999.  Upon careful

review, we affirm.[1]

On March 5, 2015, T.D.S. (Father) and his wife, C.M.S. (Stepmother),

filed petitions for the involuntary termination of Mother's parental rights to

E.D.S. and A.M.S., biological brothers whom Mother and Father adopted

---

* Former Justice specially assigned to the Superior Court.

[1] The Guardian *ad Litem* (GAL) filed a brief in this appeal in support of the
termination decree.

from Guatemala in 2005, pursuant to 23 Pa.C.S.A. § 2511(a)(1) and (b). In addition, on March 5, 2015, Stepmother filed a petition for adoption of E.D.S. and A.M.S.

Hearings were held on the termination petitions on June 26, 2015, July 31, 2015, and October 12, 2015. Father testified on his own behalf, and he presented the testimony of Tegan Blackbird, Ph.D.; the parties' daughters, T.S., age 29, and C.S., age 22; Stepmother; and Deborah L. Salem, a clinical evaluator. Mother testified on her own behalf, and she presented the testimony of Annette Cremo, Ph.D., and Laura Pittman, Ph.D.

In its opinion accompanying the subject decree, the orphans' court set forth the relevant factual and procedural history of this case, which the testimonial and documentary evidence supports. As such, we adopt it herein. *See* Trial Court Opinion, 11/18/15, at 2-5.

By decree dated and entered on November 18, 2015, the orphans' court involuntarily terminated Mother's parental rights to E.D.S. and A.M.S. On December 17, 2015, Mother timely filed notices of appeal and concise statements of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte*. The orphans' court filed its Rule 1925(a) opinion on January 14, 2016.

On appeal, Mother presents the following issues for our review:

1. Whether the [orphans'] court improperly denied Mother's request to deny Father's petition to involuntarily terminate parental rights?

2. Whether the [orphans'] court abused its discretion by terminating Mother's parental rights?

Mother's brief at 9.

We consider Mother's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b):

determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> . . .
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (b).

- 4 -

We have explained:

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re Adoption of R.J.S.*, 901 A.2d 502, 510 (Pa. Super. 2006). Notably, with respect to the six-month period prior to filing the termination petition:

> [T]he trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B.,N.M.,* 856 A.2d 847, 855 (Pa. Super. 2004) (citation omitted). In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 91 (Pa. 1998). Further,

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*Id*. at 92 (citation omitted).

We have explained "parental duties" as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

*In re B.,N.M.*, *supra* at 855 (citations omitted).

Moreover,

It is incumbent upon a parent when separated from his child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life.

*In re G.P.−R.*, 851 A.2d 967, 976 (Pa. Super. 2004).

- 6 -

With respect to Section 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010).

In her first issue on appeal, Mother argues that the orphans' court improperly denied her request to dismiss Father's involuntary termination petition. On the first day of the termination hearing, before any evidence was presented, Mother's counsel made a request on the record in open court that the court dismiss Father's petition. *See* N.T., 6/26/15, at 5-6. Counsel asserted that, within the six months immediately preceding the filing of the termination petition, Mother filed a petition for special relief and a petition for modification of the existing custody order. *Id.* The orphans' court denied Mother's request, stating, in part, "Well that's what the record may show, the record doesn't necessarily show yet. That's not in the record. You are telling me that." *Id.* at 5-6.

Mother cites *In re Adoption of M.R.D.*, 128 A.3d 1249 (Pa. Super. 2015) (*en banc*), *appeal granted*, 133 A.3d 293 (Pa. 2016), wherein we stated that, "All explanations considered, if the parent makes reasonable attempts to overcome obstacles created by the party seeking termination, then the parent's failure to pursue legal action more promptly will not alone justify termination." *Id.* at 1262 (*citing In re Adoption of L.J.B.,* 18 A.3d 1098, 1122 (Pa. 2011)). To the best that we can discern, Mother asserts that, because she filed a petition to modify custody within six months before Father filed the termination petition, the court was prohibited from terminating her parental rights under Section 2511(a)(1).

Contrary to her assertion, *M.R.D.*, *supra*, is inapplicable for the proposition Mother asserts. Neither this Court's decision in that case nor any case or statutory authority holds that pursuing legal action for custody rights within six months preceding the filing of a termination petition mandates the dismissal of the petition. Rather, a trial court "must consider the whole history of a given case and not mechanically apply the six-month statutory provision." *In re B.N.M.*, *supra*. Therefore, we conclude that the orphans' court did not err in failing to summarily dismiss Father's termination petition and conducting an evidentiary hearing in this case. Mother's first issue fails.

The evidence presented during the hearing demonstrated that, following the parties' marital separation in 2009, an agreed-upon July 15, 2010 custody order granted Father primary physical custody and Mother

supervised partial physical custody, which she never exercised.[2]  Trial Court Opinion, 11/18/15, at 2-3; Petitioner's Exhibit 1.  On December 28, 2012, Mother filed a petition for emergency relief, wherein she alleged that Father has alienated E.D.S. and A.M.S. from her.  Mother requested joint legal custody, partial physical custody, and counseling for E.D.S. and A.M.S.  Trial Court Opinion, 11/18/15, at 4; Respondent's Exhibit 5.  This resulted in a second agreed-upon custody order dated June 24, 2013, which granted Father sole legal and physical custody.  *Id.*; Petitioners' Exhibit 5.  The order directed Mother to participate in therapy with a professional selected by the custody evaluator, Deborah Salem, for the purpose of preparing her to begin the reunification process with E.D.S. and A.M.S.  Trial Court Opinion, 11/18/15, at 4; Petitioners' Exhibit 5.

The orphans' court found that, following the June 2013 order, "Mother demonstrated an inability or unwillingness to follow through, resulting in her failure to see [E.D.S. and A.M.S.] to this date."  Trial Court Opinion, 11/18/15, at 5.  The testimony of Dr. Blackbird, the professional selected by Ms. Salem, supports the court's finding.  Indeed, Dr. Blackbird testified that he met with Mother three or four times, and then she discontinued treatment.  N.T., 6/26/15, at 67.

On February 15, 2015, Mother filed a petition for modification of the June 2013 custody order.  The orphans' court aptly noted that, "[o]ther than

_____

[2] The order also granted the parties shared legal custody.  Petitioner's Exhibit 1.

a text message shortly before the first [day of the termination] hearing, Mother has not communicated with [E.D.S. and A.M.S.] since July 12, 2010." Trial Court Opinion, 11/18/15, at 5.

Nevertheless, Mother argues in her second issue on appeal that her conduct did not warrant termination of her parental rights under Section 2511(a)(1). She argues that the court "completely overlooked all of Mother's testimony. . . . The [ ] court did not consider the hostile environment that Father created for Mother and the minor boys while the parties still lived in the same house." Mother's brief at 38. We disagree.

The court explained in its opinion accompanying the subject decree as follows.

> This is not a case where Father rebuffed Mother's repeated, plaintive requests to see the boys. To the contrary, the only "roadblocks" to Mother maintaining contact with the boys and performing parental duties were two court orders. The 2010 order was entered by stipulation in open court and gave Mother an easy path to have immediate supervised visits. Her explanations were hollow regarding her failure to pick up the phone and call any of the potential supervisors or to ask the court to name a new one. Instead of swallowing her pride and moving forward, Mother did nothing and the boys went on with their lives.
>
> The 2013 order recognized Mother's failures and set forth a step-by-step plan. Although she arguably took one step forward by meeting with Dr. Tegan Blackbird, Mother failed to follow through with him, providing equally hollow excuses. After hearing Deb[orah] Salem's testimony and reviewing her evaluations, Mother's actions did not surprise us. Although much could be said, it all boils down to Mother's refusal to take responsibility for any of the problems that brought the parties to court for custody, [ ] and now the termination of her parental

- 10 -

rights. The evidence in support of termination is not only clear and convincing, it is compelling.

Trial Court Opinion, 11/18/15, at 9-10.

Upon review, we conclude that the foregoing factual findings and credibility determinations against Mother by the court are supported by the testimonial and documentary evidence. The record overwhelmingly demonstrates that Mother failed to perform her parental duties since she left the marital home in July of 2010. Since that time, Mother has neither seen nor written to E.D.S. or A.M.S. N.T., 7/31/15, at 23, 38-39. She failed to exercise her agreed-upon supervised partial physical custody set forth in the July 2010 custody order. Thereafter, she failed to pursue reunification with her sons by following the agreed-upon June 2013 custody order. Upon careful review, we discern no abuse of discretion by the orphans' court in finding hollow Mother's explanations for this conduct. Therefore, we reject Mother's argument with respect to Section 2511(a)(1).

With respect to Section 2511(b), Mother argues that the termination of her parental rights does not serve the developmental and emotional needs and welfare of E.D.S. and A.M.S. because the court "recognized that the minor boys required continuous counsel[]ing not only for the marital discord of the parties but because of the minor boys['] abusive and troubling childhood in Guatemala. Father does not believe that the minor boys require counsel[]ing if Mother remains out of their lives." Mother's brief at 35. As

such, Mother argues that, by terminating her parental rights, the court "has ensured the minor boys will not receive counsel[]ing." *Id.* at 55.

In its Rule 1925(a) opinion, the orphans' court responded as follows.

Ironically, our exchange with counsel at the close of the proceedings was laden with our concerns that the boys would need counseling to deal with this situation. [N.T., 10/12/15, at 80-85.] Likewise, we were concerned with the counseling the boys received over the years. In short, we did consider this, but the best counseling in the world would only help the boys deal with Mother's actions and inactions -- it would not have changed the end result of termination.

Trial Court Opinion, 1/14/16, at 8 (footnote omitted).

We agree with the court that, whether or not Father obtains counseling in the future for E.D.S. and A.M.S. is irrelevant to the termination of Mother's parental rights pursuant to Section 2511(b). Indeed, the emphasis in a Section 2511(b) analysis is on the nature and status of the parent-child bond and whether severing that bond will be detrimental to the physical, developmental, and emotional needs and welfare of the child. *See In re Adoption of J.M.*, *supra*.

The orphans' court aptly found:

The record of this case is replete with evidence that there is no bond between the boys and Mother. Indeed, as noted in Deb[orah] Salem's evaluations, to the extent there was a bond, it was unhealthy. Additionally, Mother could not point to any evidence that a bond still exists, and her expert failed to convince us that reunification counseling should be pursued to see if a bond could be forged. . . .

[W]e are eminently satisfied that [Stepmother] has been *the* mother for at least the past four years and is the only one capable of providing that nurturing relationship alongside of

Father. In fact, we are more concerned with the impact on the boys' relationship with [Stepmother] if we attempted Mother's request for reunification counseling. That would be a travesty - it might serve to assuage Mother's feelings of guilt, but it would not to be beneficial to the boys in any way, shape[,] or form. Indeed, the mere receipt of a text from Mother sent one child into a near tailspin.[3]

[ ] The evidence is clear, convincing and competent to demonstrate not only that Mother has failed to perform her parental duties, but also that termination of Mother's parental rights will best serve the boys' physical, developmental, and emotional needs and welfare.

Trial Court Opinion, 11/18/15, at 10-11 (emphasis in original).

Upon careful review of the testimonial evidence, we discern no abuse of discretion by the court in terminating Mother's parental rights pursuant to Section 2511(b). Further, we conclude that the entirety of the court opinions comprehensively expound on Mother's issues, and we adopt and incorporate the orphans' court's November 18, 2015 and January 14, 2016 opinions with this Memorandum in affirming the termination decree.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/11/2016

---

[3] Father testified that, in May 2015, Mother sent a text message to E.D.S. wishing A.M.S. a happy birthday. N.T., 6/26/15, at 10. Father testified that A.M.S. "was so scared [Mother] was going to come and get him. It was horrible." *Id.* at 40.

- 13 -

IN RE: ADOPTION OF : IN THE COURT OF COMMON PLEAS OF
E.D.S., a minor : CUMBERLAND COUNTY, PENNSYLVANIA
:
: 19 ADOPTIONS 2015 ✓

---------------------------------------------------------

IN RE: ADOPTION OF : IN THE COURT OF COMMON PLEAS OF
A.M.S., a minor : CUMBERLAND COUNTY, PENNSYLVANIA
:
: 20 ADOPTIONS 2015

### IN RE: OPINION PURSUANT TO PENNSYLVANIA RULE OF

### APPELLATE PROCEDURE 1925

**Masland, J., January 13, 2016:--**

#### I.        Introduction

N.M.S. (Mother) has appealed our orders of November 16, 2015 terminating her parental rights to her minor children E.D.S. (born July 2000) and A.M.S. (born May 1999). Our orders were accompanied by a fairly detailed opinion, which we incorporate herein. Understandably, Mother has raised numerous issues in her relatively concise statement, some of which call for more than a simple "it's in there" response. Nevertheless, having reviewed our opinion carefully, we are satisfied that our decision was not only appropriate, but was also fully supported by the record. Therefore, we will supplement our prior opinion with a seriatim treatment of Mother's issues, directing the court to pertinent aspects in the record where necessary. We will not engage in any further recitation of the factual or procedural background of the case unless it is crucial to address Mother's claim of error. In short, the appellate courts will have more than enough to review without our long-windedness.

2016 JAN 14 AM 10 : CLERK OF ORPHANS' COURT CUMBERLAND — RECORDED OFFICE OF REGISTER OF WILLS



## II. Discussion

**A. Whether the Trial Court erred in determining that the threshold analysis had been met by Petitioner Father to proceed with termination of parental rights?**

> **1. The Trial Court did not consider custody court's denial of Appellant's Petition for Special Relief to recognize Dr. Laurie Pittman as a suitable counselor for reunification in December 2014.**

As we could state repeatedly in this opinion, it is *not* the case that we failed to consider, in this instance, the denial of Mother's petition. To the contrary, we considered all the testimony and exhibits submitted during the hearings on June 26, 2015, July 31, 2015, and October 12, 2015. However, the weight we accorded each statement and document varied immensely. Furthermore, in striking a balance between issuing an epic opinion and providing sufficient material for the parties to understand our position, some "scenes" wound up on the cutting room floor.

With respect to the Petition for Special Relief, it was noted briefly at the hearing on June 26, 2015. Initially, T.S. (Father) acknowledged on cross that he was contacted by Dr. Pittman about counseling but denied the request because "[t]hat's not the court order."[1] In her direct examination, Mother noted the Petition was filed on December 8, 2014, and, because it was denied she filed her modification petition on February 5, 2015.[2]

In short, in the context of this case, a filing for special relief two months before the filing for modification does not change our calculus with respect to the

---

[1] Notes of Testimony, June 26, 2015, at 42, (hereafter N.T., June 26, at __)
[2] N.T., June 26, at 244-6.

threshold issue - Father's petitions for termination were not retaliatory in nature. At best, Mother's request for reunification counseling signals a desire on her part to revive the ties that languished and died as a result of her own actions. As such, this speaks more to the issue of the existence of any bond and not Father's actions in filing for termination.

Nevertheless, because of this claim of error regarding the petition and in the interest of seeing if we missed something, we reviewed the custody court's denial, which was done without any elaboration, on January 9, 2015. Although the one-sentence order was not entered as an exhibit, it was referenced briefly by Mother and Dr. Pittman. We note that we would have denied the Petition summarily as well. Given Dr. Pittman's role as Mother's individual therapist beginning on July 31, 2014, the prospect of her also serving as reunification therapist in December 2014, strikes us as highly inappropriate, and indeed, Dr. Pittman acknowledged that herself.[3] Thus, this "error" is inconsequential at best.

Finally, our November 16 analysis of *In re: Adoption of: M.R.D. and T.M.D., Minor Children*, 2015 PA Super 32, was proven to be correct by the December 8 *en banc* Superior Court opinion at 2015 PA Super 255. In short, President Judge Gantman's opinion confirms our conclusion that Father's motivation for filing to terminate Mother's rights was not retaliatory.

**B.     Whether the Trial Court committed reversible error by terminating Appellant's parental rights?**

---

[3] Notes of Testimony July 31, 2014, at 234, (hereafter N.T., July 31, at __).

**1. The Trial Court completely overlooked all of Appellant's testimony which has been Appellant's concern with the trial court's handling of the custody matter.**

We did not overlook Mother's testimony in general, nor her concerns with the handling of the custody action in particular. We found her words and her actions, or lack thereof, regarding the custody action to be unconvincing. As we regularly advise juries, they are free to believe "all, part or none" of the testimony of a witness. We found very little of Mother's testimony convincing and, therefore, rarely cited it in our opinion, except where noting our acceptance of the obverse.

**2. The Trial Court did not consider Appellant's testimony regarding years of counselling she received prior to filing that petition through custody court.**

Paradoxically, we are not unsympathetic toward Mother's need for counseling and acknowledge that the record reflects her meeting with several counselors over the years. Unfortunately for Mother, the record reflects a failure to follow through on the custody court's clear directions regarding counseling in its order of June 24, 2013, which we included in our earlier opinion and excerpt herein for ease of reference:

1. Sole legal and physical custody of A.M.S. and E.D.S. shall be with Father.

2. Deb Salem shall select a therapist for Mother and shall notify counsel for both parties.

3. Within 14 days, Mother shall contact the selected therapist and schedule an appointment. She shall then notify Deb Salem of the date of the appointment, and Deb Salem will then discuss the

-4-

goals and context of the therapy with the selected therapist.

4. Mother's therapist shall contact Deb Salem when he or she believes Mother has reached the point where she is imminently ready to begin the reunification process.

5. Deb Salem will then instruct Father to begin preparatory therapy for the boys. Said therapy shall occur for six weeks.

6. At the end of the six weeks of preparatory therapy for the boys, a reunification strategy shall be developed jointly by Mother's therapist, the boy's therapist, and Deb Salem.

7. The parties shall cooperate with the selected strategy that has been developed.

Instead of focusing on this course of counseling, which would have provided the reunification she claims to desire, Mother wants credit for doing her own thing. Had she abided by these directions, we might not be writing this opinion.

### 3. The Trial Court did not identify Deborah Salem's errors or failures regarding her involvement in the custody proceedings.

We did not "identify" Ms. Salem's errors or failures because we found none. She is not a flawless evaluator, but had we presided over the custody action, we would have welcomed and followed her guidance. Moreover, regardless what we might have done, the parties chose to follow her guidance in the stipulated custody order of July 2010, and they were directed to follow her guidance in the 2013 order as set forth above.

Mother's counsel may suggest a few errors, but our review of Ms. Salem's testimony yielded no "smoking guns." Rather, we found confirmation of Mother's

failures throughout Ms. Salem's testimony. We are confident Ms. Salem's

evaluations and testimony will be closely reviewed; therefore, we point to three

statements that encapsulate her efforts:

a. Her Approach – "Essentially, every custody evaluator has one job and it is to look into and investigate the best interests of the children. It isn't to weigh-in on somebody's side. It isn't to proffer an opinion for any one specific person, but rather to look directly at the children."[4]

b. Her Desire – "I did not believe it was fair not to give [Mother] another chance ... and I thought with the right intervention, with dad having primary, that it could be worked out. And nothing would be better for the boys then [sic] for them to know it wasn't going to be a repeat performance."[5]

c. Her Disappointment – "And the most profound thing I want to repeat is, there was never the need to have therapy and pay for therapy before supervised contact with the boys could begin. If you read the court order, that was not at all a requirement. And I believe it was in [Mother's] and the boys' best interest to begin to see each other right away ... There was no – that wasn't the restriction."[6]

In sum, Ms. Salem was not only credible and convincing, but was also

compassionate. Would that Mother had appreciated this.

### 4. The Trial Court did not consider the Petitioner Father's failure to comply with the Orders for Custody.

We did not operate under the delusion that Father was a paragon of virtue

throughout this saga. That was clear from his own testimony, not to mention Ms.

Salem's even-handed assessment. We recognize the need for zealous

advocacy, but this argument only confirms Mother's delusion that everyone else

---

[4] N.T., July 31, at 149.
[5] N.T., July 31, at 159.
[6] N.T., July 31, at 175-6.

is to blame. Further argument on our part would appear abusive and we will yield to Father's counsel on this point.

## 5. The Trial Court did not consider Dr. Laurie Pittman's assessment of Petitioner Father allowing the parties' adult daughters to testify.

In family matters, we would rather chew tinfoil than hear a child testify against a parent … a parent testify against a child … a brother testify against his brother … but, alas, such is the lot of family law judges. Dr. Pittman's assessment that Father was a bad father for allowing his adult daughters to testify is wonderful in theory; however, the record in this case would not be complete without the testimony of the daughters. Further, if Mother could have benefited from their testimony, as with her manipulation of the boys, she would have placed them on the stand in an instant.

## 6. The Trial Court did not consider Appellant's concerns and issues with Dr. Tegan Blackbird.

We found Mother's concerns with Dr. Blackbird to be appallingly insignificant when viewed in light of what she knew she had to do for reunification. As Ms. Salem's noted incredulously, "somehow the payment of therapy and other things just seemed to be the reason [for not following through with Dr. Blackbird] …"[7] We share Ms. Salem's incredulity regarding Mother's excuses. Conversely, Dr. Blackbird was credible and, despite Mother's excuses, offered the clearest avenue to reunification.

---

[7] N.T., July 31, at 176.

**7. The Trial Court did not consider Dr. Laurie Pittman's assessment of the minor's need for counselling during the custody proceedings.**

Ironically, our exchange with counsel at the close of the proceedings was laden with our concerns that the boys would need counseling to deal with this situation.[8] Likewise, we were concerned with the counseling the boys received over the years. In short, we did consider this, but the best counseling in the world would only help the boys deal with Mother's actions and inactions – it would not have changed the end result of termination.

**8. The Trial Court did not consider the Petitioner Father's violent conduct towards Appellant.**

We are not shocked with Mother's approach to this appeal. She must take the focus off her behavior and place it elsewhere. Father and the court are the obvious and usual suspects. Thus, there are several claims of error dealing with our lack of appreciation of how horrible Father was to Mother. No doubt, the parties were the worst of spouses, but laying some blame at Father's feet does not justify Mother's failure to be a mother. As noted, we did not accept much of Mother's testimony as being credible. Perforce, this tempered our view of Mother's allegations about Father's conduct.

**9. The Trial Court did not consider Dr. Laurie Pittman's assessment of Appellant.**

We considered Dr. Pittman's relatively brief testimony in its entirety, and in conjunction with all the other testimony, we formed an opinion of Mother's behavior. The testimony of Dr. Pittman augmented our views, but given that her

---

[8] Notes of Testimony, October 12, 2015, at 80-85, (hereafter N.T., October 12, at __).

primary source of information was Mother, who was only partially credible, we did

not accept her assessment as a means to transform Mother into the victim role

she has assumed.

### 10. The Trial Court did not recognize Appellant's compliance with custody orders' recommendations.

Mother's compliance with a few aspects of the custody orders was far

outweighed by her non-compliance, which has been amply discussed already.

## C. Whether the Trial Court committed reversible error in determining that the best interest of the Children would be served by terminating parental rights?

Although the best interest of the children was covered substantially in our

November opinion, we will briefly address Mother's specific claims of error.

### 1. The Trial Court did not consider Dr. Tegan Blackbird's testimony that the minor was receptive to reunification.

To say that the boys were receptive to reunification is an overstatement. It

was our impression that the boys were "tentatively" receptive to *meeting* with

Mother, not that they were receptive to the entire reunification process.

Regardless, Mother never allowed matters to proceed to even the first meeting.

We suggest that the court review Dr. Blackbird's testimony as a whole and

not an isolated statement. Taken as a whole, we concluded the following:

> a. Dr. Blackbird's goal was to help Mother become more aware of her own issues and the needs of the boys in preparation for reunification.
>
> b. Unlike Mother's individual therapists/counselors, Dr. Blackbird was aware of the animosity and hostility coming from both parents and noted that Mother needed to work through her anger and her feelings of victimization.

c. On September 17, 2013, Dr. Blackbird laid the groundwork for an initial meeting between the boys and Mother. Despite their strong resistance to having any relationship with Mother, Dr. Blackbird successfully moved the boys towards a willingness to at least meet with Mother.

d. On September 18, 2013, Dr. Blackbird attempted to challenge Mother to address the 2½ years of no contact with the boys. Unfortunately, because Mother discontinued treatment after she was confronted with her own behavior in this fourth and final session, they never reached the point contemplated in the 2013 order. Thus, Dr. Blackbird never contacted Ms. Salem to inform her that Mother was "imminently ready to begin the reunification process."

In sum, because of Mother's failure to follow through on the second chance afforded her, we resolved that the boys must not be forced, over two years later, down another road of trauma and disappointment.

## 2. The Trial Court did not consider the issues presented by the minor not attending counselling throughout the custody proceedings.

There were many troubling aspects of this case. However, the nature and frequency of the counseling received by the boys was far from determinative. Notably, the counseling the boys received following the 2010 order, coupled with Mother's failure to avail herself of supervised visits, resulted in a positive change in their demeanor as recognized by Dr. Blackbird and Ms. Salem. Admittedly, their attitudes and outlook were improved largely because of Mother's unforced absence and the feeling that the relationship with her was over – things that may require counseling down the road. Nevertheless, we will not fault Father for living in a state of denial created by Mother.

3. **The Trial Court did not consider the issues in which the minor attended counselling with Wendy Woods.**

Please see the previous response.

4. **The Trial Court did not consider Stephanie Cesare, Esquire's, the Guardian ad Litem, recommendation in her Report of the Guardian ad Litem dated June 24, 2015.**

We found the report of the GAL to be helpful and appreciated her questions to the witnesses in our effort to ferret out the truth as the hearings progressed. We also found her summation helpful. Notably, at no point did the GAL state definitively whether she believed termination was appropriate. In a very tactful and proper manner, she pointed out her concerns with both parties and her overriding concerns for the boys. As with almost every other aspect of this case, the information from and through the GAL confirmed the need for termination, not reunification.

5. **The Trial Court did not consider Petitioner Father's abhorrent conduct towards Appellant in considering the well-being of the minor.**

As often happens when counsel repeatedly ask the same questions in court, we respond with simply "asked and answered."

6. **The Trial Court did not consider Dr. Laurie Pittman's testimony regarding the necessity for counselling for the minor, the concern for the lack of counselling and the issue with Petitioner allowing the parties' adult children to testify.**

Our concerns with the boys future needs for counseling were and are genuine, but they do not trump Mother's failure to be a mother. Please refer to our response to error B. 7.

7. **The Trial Court did not address Appellant's testimony or Father's failure to work with Appellant regarding adopting new supervisors to monitor children.**

Sadly, the error here is that Mother cannot accept responsibility for failing to pick up the phone and contacting any of the proposed supervisors.

8. **The Trial Court did not consider Petitioner Father's failures regarding the custody orders and the responsibility of Father to have the minor participate in counselling.**

Asked and answered.

### III.    Conclusion

We regret that in responding to Mother's claims we may sound harsh and insensitive.  We hope that it was not unduly so and have tried to temper and cleanse our remarks where possible.  Nevertheless, our ultimate goal is not to provide balm for the parties, but for the boys.  Sadly, we have concluded that can only be accomplished by termination of Mother's rights.

By the Court,

Albert H. Masland, J.

Jeanné B. Costopoulos, Esquire
For Petitioners

Damian J. DeStefano, Esquire
For Nanci Mariko Samento

Stephanie Cesare, Esquire
Guardian *ad litem* for the Children

:sal

-12-

In Re: EDS & AMS

: ORPHANS' COURT DIVISION
: COURT OF COMMON PLEAS OF
: CUMBERLAND COUNTY
: PENNSYLVANIA
:
: NO. 19 ADOPT 2015 & 20 ADOPT 2015

## CERTIFICATE OF SERVICE OF ORDER

ORDER DATE: 01/13/2016

JUDGE'S INITIALS: AHM

TIME STAMP DATE: 01/14/2016

IN RE: OPINION

...........................................................................................................

SERVICE TO: JEANNE COSTOPOULOS, 5000 RITTER RD STE 202, MECHANICSBURG PA 17055
DAMIAN DESTEFANO, 2331 MARKET ST, CAMP HILL PA 17011
STEPHANIE CESARE, 2 W HIGH STREET, CARLISLE PA 17013

| METHOD OF MAILING: | ENVELOPES PROVIDED BY: |
|---|---|
| ☒ USPS | ☐ PETITIONER |
| ☐ RRR | ☒ JUDGE |
| ☐ HAND DELIVERED | ☐ CLERK OF ORPHANS COURT |
| ☐ OTHER _____ | |

MAILED: 01/14/2016

...........................................................................................................

SERVICE TO: _____

| METHOD OF MAILING: | ENVELOPES PROVIDED BY: |
|---|---|
| ☐ USPS | ☐ PETITIONER |
| ☐ RRR | ☐ JUDGE |
| ☐ HAND DELIVERED | ☐ CLERK OF ORPHANS COURT |
| ☐ OTHER _____ | |

MAILED: _____

Deputy
Clerk of Orphans' Court

IN RE:  ADOPTION OF             :  IN THE COURT OF COMMON PLEAS OF
E.D.S., a minor                  :  CUMBERLAND COUNTY, PENNSYLVANIA
                                     :
                                     :  19 ADOPTIONS 2015

------------------------------------------------------

IN RE:  ADOPTION OF             :  IN THE COURT OF COMMON PLEAS OF
A.M.S., a minor                  :  CUMBERLAND COUNTY, PENNSYLVANIA
                                     :
                                     :  20 ADOPTIONS 2015

## IN RE:  TERMINATION OF PARENTAL RIGHTS

### ORDER OF COURT

AND NOW, this ___*18th*___ day of November, 2015, following hearings on June 26, 2015, July 31, 2015, and October 12, 2015, the Petitions for Involuntary Termination of Parental Rights of N.S. with respect to E.D.S. (born July 2000) and A.M.S. (born May 1999) are hereby **GRANTED** and her parental rights are **TERMINATED** forever, with all the effects of such decree as provided in Section 2521 of the Adoption Act, including extinguishment of the power or right to object to or receive notice of adoption proceedings.

Sole physical and legal custody of E.D.S. and A.M.S. is hereby awarded to Petitioner, T.S.

By the Court,

Albert H. Masland, J.





19 ADOPTIONS 2015
20 ADOPTIONS 2015

Jeanné B. Costopoulos, Esquire
For Petitioners

Damian J. DeStefano, Esquire
For Nanci Mariko Samento

Stephanie Cesare, Esquire
Guardian *ad litem* for the Children

:sal

| IN RE: ADOPTION OF | : IN THE COURT OF COMMON PLEAS OF |
| E.D.S., a minor | : CUMBERLAND COUNTY, PENNSYLVANIA |
| | : |
| | : 19 ADOPTIONS 2015 |

-----------------------------------------------------

| IN RE: ADOPTION OF | : IN THE COURT OF COMMON PLEAS OF |
| A.M.S., a minor | : CUMBERLAND COUNTY, PENNSYLVANIA |
| | : |
| | : 20 ADOPTIONS 2015 |

## IN RE: TERMINATION OF PARENTAL RIGHTS

## OPINION AND ORDER OF COURT

**Masland, J., November 18, 2015:--**

### I.    Introduction

Before the court are the Petitions for Involuntary Termination of the Parental Rights of N.M.S. (Mother) filed by T.S. (Father) and C.S. (Adoptive Mother) regarding the minor children E.D.S. (born July 2000) and A.M.S. (born May 1999). Because the parties are well aware of the tortuous procedural and factual background of this case, we will save the full recitation for a likely 1925 opinion for the Superior Court.

As a wiser jurist than I advised me, "tough cases do not get easier with time." This case may be simple from the perspective of what must be done; however, doing it is far from easy. Although this matter has been prolonged far too long by the parties themselves, my characteristic reluctance to terminate has extended their anxiety longer than warranted.

Therefore, we will not countenance the quixotic, time-consuming measures that would be required by Mother's last-ditch request to fan embers

that have long since grown cold. Instead, in recognition that there are no bonds to salvage, we will terminate Mother's parental rights – the only measure that will provide hope for the children. Nevertheless, out of recognition for the pain this will cause Mother, we issue this opinion with only the basic, unembellished facts necessary to support our decision.

## II.    Background

Mother and Father adopted the minor children in 2005, in an international adoption that removed them from a physically abusive home in Guatemala. The children, natural brothers, joined a seemingly well-adjusted family that included three now-adult sisters, B.S., Ti.S. and C.S.

Sadly, within four years the marriage had deteriorated to the point that Father filed for divorce in November of 2009. We will not recite the myriad of allegations that arose as to the cause of the marital problems. Suffice it to say that neither Mother nor Father was the best of spouses. More importantly for our purposes, the first custody order issued on July 15, 2010, not only noted the parties' intense animus for one another, but also recognized deficits in their parental abilities, particularly Mother's.

Significantly, the July 2010 order was the result of a comprehensive stipulation presented in open court, which resulted primarily from a detailed custody evaluation conducted by Deb Salem. Father was awarded legal custody and primary physical custody, and Paragraph 2(B) 1 and 2 of the order granted Mother partial custody of the boys as follows:

> Alternating weekends, Saturdays and Sundays
> from 10:00 a.m. to 4:00 p.m., not overnight, and every

Thursday from 3:00 p.m. to 9:00 p.m. **All contact between mother and the boys will be supervised.** The supervisor for mother's time with the boys can be mutually agreed upon by both parents and their respective counsel and need not be a professionally paid supervisor. **The parties specifically agree** that Angel Garcia **or** the youth leaders from either Grace Community Church in Mechanicsburg **or** West Shore Free in Mechanicsburg are acceptable supervisors. **In the event these supervisors are unwilling or unavailable to provide supervision, and the parties cannot agree on an alternate supervisor, either party may request a conciliation conference or hearing before the judge to make a final determination without the need of additional pleadings.**

**Mother's access to the boys will be limited to the supervised schedule set forth above until there is certainty through her chosen therapist in collaboration with the chosen therapist for the boys that mother can carry out what is needed to stop the alienation strategies with the boys.** With these interventions in place, it is hoped that there will be a gradual increase in mother's time to unsupervised alternating weekends, from Friday through Sunday overnight, with a possible right of first refusal to care for the boys at times when father is working and she is not. (emphasis added)

Although there was much disagreement in our hearings regarding the import and ramifications of the order, for background purposes it is important to note solely that despite an agreement that awarded Mother partial custody, albeit supervised, Mother *never* exercised her rights under this order. Indeed, the custody action was dormant for over two years, with the arguable exception of Mother's Petition for Special Relief filed on January 27, 2011. That petition alleged, *inter alia*, that Father had posted derogatory remarks, photos and other matters on Facebook, which caused Mother "great mental and physical pain

[and] have also caused undeterminable damage to the minor children; but, have now grown to such a degree that [Mother] fears for her safety." ¶ 13. Mother's prayer for relief in this Petition sought removal of the alleged defamatory postings and expressed concern that the children "may gain access to" the materials. Notably, Mother did not request any relief related to physical custody of the boys.

On December 28, 2012 Mother filed Petition for Emergency Relief that expressed concern regarding alienation and requested joint legal custody, partial physical custody and counseling for the boys. Deb Salem was again appointed by the court to conduct an updated evaluation. The court relied upon her recommendations, when it issued its order of June 24, 2013, which provided:

1. Sole legal and physical custody of A.M.S. and E.D.S. shall be with Father.

2. Deb Salem shall select a therapist for Mother and shall notify counsel for both parties.

3. Within 14 days, Mother shall contact the selected therapist and schedule an appointment. She shall then notify Deb Salem of the date of the appointment, and Deb Salem will then discuss the goals and context of the therapy with the selected therapist.

4. Mother's therapist shall contact Deb Salem when he or she believes Mother has reached the point where she is imminently ready to begin the reunification process.

5. Deb Salem will then instruct Father to begin preparatory therapy for the boys. Said therapy shall occur for six weeks.

6. At the end of the six weeks of preparatory therapy for the boys, a reunification strategy shall be developed jointly by Mother's therapist, the boy's therapist, and Deb Salem.

7. The parties shall cooperate with the selected strategy that has been developed.

The saddest and most salient fact in this case is that following this second order, in which our colleague laid out the best of plans, Mother demonstrated an inability or unwillingness to follow through, resulting in her failure to see the boys to this date. And, as with her previous failures, Mother blames everything on forces and individuals outside of her control. Mother's litany of culprits is comprehensive, but, as we will discuss below, we fail to see the conspiracy to thwart her desire to be a mother. Rather, her actions and inactions speak volumes. Other than a text message shortly before the first hearing, Mother has not communicated with the boys since July 12, 2010.

Three significant dates remain. On January 10, 2015, Father married his current wife, C.S. On February 15, 2015, Mother filed a Petition for Modification of the 2013 order. The termination petitions were filed on March 4, 2015.

A pre-trial conference was held on May 7, 2015, with counsel and the GAL in attendance. Hearings were held on June 26, 2015, July 31, 2015, and October 12, 2015.

### III. Discussion

### A. The Petitions for Termination – Retaliatory or Preventive?

Mother's threshold argument against termination is that the petitions for termination were retaliatory in nature, having been filed in response to her petition for modification of the custody order. Mother's pretrial memorandum relied on the Superior Court opinion of *In re: Adoption of: M.R.D. and T.M.D., Minor Children*, 2015 PA Super 32; however, the majority and dissenting

-5-

opinions were withdrawn on April 1, 2015 and the court, sitting *en banc*, heard argument on June 30, 2015. Although not controlling, we have reviewed the *M.R.D.* opinions carefully, as well as *In re Adoption of L.J.B.*, 18 A.3d 1098 (Pa. 2011), upon which the majority in *M.R.D.* relied heavily.

Because termination cases are highly fact dependent, our review of both *M.R.D.* and *L.J.B.* satisfies us that the lives of E.D.S and A.M.S need not await further refinement of the law from our appellate courts. Irrespective of the outcome of *M.R.D.*, we anticipate a Supreme Court review. Though we may benefit from the abstract theory, if the Superior Court renders a decision before we are called to write an opinion for that court, the concrete details of this case defy comparison and eschew further delay.

Not surprisingly, we are more inclined toward President Judge Gantman's dissenting opinion in *M.R.D.*, which gave deference to the trial court, noting:

> I think the majority misapplies the appropriate standard of review. Although the majority acknowledges the Orphans' court found Maternal Grandfather's testimony credible, the majority improperly reweighs the evidence and decides the principal purpose of Mother and Maternal Grandfather's petition for involuntary termination of Father's parental rights was to punish or retaliate against Father for seeking custody. I think the majority infuses the petition with punitive intent. Contrary to the majority's view, I maintain we should permit the Orphans' court to sit as the fact-finder in the case and respect the court's findings on the credibility of the witnesses and the motivation for their actions.
>
> ***
>
> In this statement, the court made clear it believed Mother and Maternal Grandfather's objective in filing their petition was to protect Children and **not** to

> retaliate or get even with Father. The timing of their petition is not dispositive of punitive intent, particularly in light of the court's conclusion otherwise. We are an error-correcting Court, without authority to reverse credibility determinations, which the record supports, simply to reach a different conclusion. [1]

> Dissenting Opinion at 19-20 (emphasis in the original; citations omitted)

Mother believes that the timing of the filings is determinative. We disagree. While, in theory, it may appear that everything is "an equal and opposite reaction" to something else, in reality such conclusions often lack the requisite depth of analysis. Based on all the evidence, we find the termination petitions were neither retaliatory nor punitive in nature ... or even by design. Initially, we note that Father's marriage to C.S. occurred one month *before* Mother's petition was filed. Technically, his marriage was a necessary precursor to termination, as Father could not have filed in the absence of a prospective step-parent's intention to adopt. *See* 23 Pa.C.S. § 2512(b). Practically, its timing was based on confirming a genuine relationship – it was not a plan to foil Mother's then-unknown intention to file for modification.

Further, as our Supreme Court has noted, the legislative intent for involuntary terminations:

> Is not to punish an ineffective or negligent parent, or provide a means for changing the surname of the child. Rather, the purpose of involuntary termination of parental rights is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child.

---

[1] We are aware that this is an unreported *and* withdrawn opinion. Although it informs us, our decision is independent of its analysis.

*In re: B.E.*, 377 A.2d 153, 156 (Pa. 1977).

To be sure, at one level, Father harbors sufficient animus to want nothing less than to punish Mother, who has been both ineffective and negligent for five years. And, the petitions were at least a partial reaction to Mother's resurfacing. Nevertheless, we find the overriding purpose of the termination petitions was to provide for the boys' futures and protect them from the past. Thus, we will not quibble over what it takes for a reaction to be punitive. We have yet to see a litigant who is "pure in heart," perhaps because we are too tainted to perceive. But, if that is the test we are to impose in this or any matter, precious little relief will trickle from our spigots.

Just as the petitions sought to prevent the infliction of unnecessary trauma, our order does likewise. Sadly, no matter how much we claim that our intent is not to punish Mother, we recognize that from her perspective, that is the effect. We regret that fact, but do not apologize – we are more concerned for the boys' wellbeing.

## B. Grounds for Termination

Having passed the threshold, we find that Petitioners have proven by clear and convincing evidence that termination of Mother's parental rights is appropriate pursuant to 23 Pa.C.S. § 2511(a)(1), which provides as follows:

> (a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing

> parental claim to a child or has refused or
> failed to perform parental duties.

Although Mother's Petition for Modification falls within the 6-month "look back" period, in the context of the last five years of this saga, we will not accord it an elevated status. A solitary petition in a sea of indifference is not evidence that she has no settled purpose of relinquishing her parental claim, and it does not counter the evidence of her refusal and failure to perform any parental duties.

This is not a case where Father rebuffed Mother's repeated, plaintive requests to see the boys. To the contrary, the only "roadblocks" to Mother maintaining contact with the boys and performing parental duties were two court orders. The 2010 order was entered by stipulation in open court and gave Mother an easy path to having immediate supervised visits. Her explanations were hollow regarding her failure to pick up the phone and call any of the potential supervisors or to ask the court to name a new one. Instead of swallowing her pride and moving forward, Mother did nothing and the boys went on with their lives.

The 2013 order recognized Mother's failures and set forth a step-by-step plan. Although she arguably took one step forward by meeting with Dr. Tegan Blackbird, Mother failed to follow through with him, providing equally hollow excuses. After hearing Deb Salem's testimony and reviewing her evaluations, Mother's actions did not surprise us. Although much could be said, it all boils down to Mother's refusal to take responsibility for any of the problems that brought the parties to court for custody, divorce and now the termination of her

rights. The evidence in support of termination is not only clear and convincing, it is compelling.

## C.    Bond

Having found that Petitioners have satisfied the requirements of Section 2511(a), we proceed to the "best interest" analysis under Section 2511(b), as set forth below:

> (b) Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

The record of this case is replete with evidence that there is no bond between the boys and Mother. Indeed, as noted in Deb Salem's evaluations, to the extent there was a bond, it was unhealthy. Additionally, Mother could not point to any evidence that a bond still exists, and her expert failed to convince us that reunification counseling should be pursued to see if a bond could be forged. That is the epitome of an exercise in futility. As painful as that summary may sound to Mother, we will avoid further moralizing until an appeal is filed.

On the other side of the analysis, we are eminently satisfied that Adoptive Mother has been *the* mother for at least the past four years and is the only one capable of providing that nurturing relationship alongside of Father. In fact, we

are more concerned with the impact on the boys' relationship with Adoptive Mother if we attempted Mother's request for reunification counseling. That would be a travesty – it might serve to assuage Mother's feelings of guilt, but it would not be beneficial to the boys in any way, shape or form. Indeed, the mere receipt of a text from Mother sent one child into a near tailspin.

In conclusion, the prospects for reunification are so slim that anything other than termination is a disservice. The evidence is clear, convincing and competent to demonstrate not only that Mother has failed to perform her parental duties, but also that termination of Mother's parental rights will best serve the boys' physical, developmental, and emotional needs and welfare. Accordingly, the following order will be entered:

### ORDER OF COURT

AND NOW, this _____ day of November, 2015, following hearings on June 26, 2015, July 31, 2015, and October 12, 2015, the Petitions for Involuntary Termination of Parental Rights of N.S. with respect to E.D.S. (born July 2000) and A.M.S. (born May 1999) are hereby **GRANTED** and her parental rights are **TERMINATED** forever, with all the effects of such decree as provided in Section 2521 of the Adoption Act, including extinguishment of the power or right to object to or receive notice of adoption proceedings.

Sole physical and legal custody of E.D.S. and A.M.S. is hereby awarded to Petitioner, T.S.

By the Court,

Albert H. Masland, J.

-11-

19 ADOPTIONS 2015
20 ADOPTIONS 2015


Jeanné B. Costopoulos, Esquire
For Petitioners

Damian J. DeStefano, Esquire
For Nanci Mariko Samento

Stephanie Cesare, Esquire
Guardian *ad litem* for the Children

:sal

|  |  | : | ORPHANS' COU___ DIVISION |
|---|---|---|---|
| In Re: AMS |  | : | COURT OF COMMON PLEAS OF |
|  |  | : | CUMBERLAND COUNTY |
|  |  | : | PENNSYLVANIA |
|  |  | : |  |
|  |  | : | NO. 20 ADOPT 2015 |

### CERTIFICATE OF SERVICE OF ORDER

ORDER DATE:  11/18/2015

JUDGE'S INITIALS:  AHM

TIME STAMP DATE:  11/18/2015

IN RE:  ORDER OF COURT

..........................................................................................................................

SERVICE TO:  JEANNE COSTOPOULOS, 5000 RITTER RD, STE 202, MECHANICSBURG PA 17055
STEPHANIE CESARE, 2 W HIGH ST, CARLISLE PA 17013
DAMIAN DESTEFANO, 2331 MARKET STREET, CAMP HILL PA 17011

METHOD OF MAILING:

☒ USPS
☐ RRR
☐ HAND DELIVERED
☐ OTHER _____

ENVELOPES PROVIDED BY:

☐ PETITIONER
☒ JUDGE
☐ CLERK OF ORPHANS COURT

MAILED: 11/18/2015

..........................................................................................................................

SERVICE TO:  _____

METHOD OF MAILING:

☐ USPS
☐ RRR
☐ HAND DELIVERED
☐ OTHER _____

ENVELOPES PROVIDED BY:

☐ PETITIONER
☐ JUDGE
☐ CLERK OF ORPHANS COURT

MAILED: _____

_____
Deputy
Clerk of Orphans' Court