J-S73029-18

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| IN RE: J.M.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: J.C.M. | No. 912 WDA 2018 |

Appeal from the Order Entered May 25, 2018
In the Court of Common Pleas of Washington County
Orphans' Court at No(s): 63-18-295

BEFORE: GANTMAN, P.J., BENDER, P.J.E., and OLSON, J.

MEMORANDUM BY BENDER, P.J.E.:             FILED FEBRUARY 1, 2019

J.C.M. (Father) appeals from the May 25, 2018 order granting N.R.L.'s

(Mother) petition seeking the involuntary termination of Father's parental

rights to the minor child, J.M.M. (Child), so that N.L. (Stepfather) can adopt

Child. After review, we affirm.

The trial court summarized the background of this case as follows:

> [C]hild J.M.M. was born [i]n August [of] 2014, [and was] not quite four years of age [at the time the termination hearing was held]. At the time of [C]hild's birth, [] Mother and Father were not married to each other, but were living together in Charleroi, Pennsylvania. Shortly thereafter, the three moved to Denver, Colorado to get a new start. The parents' relationship was rocky and in August of 2016 they separated and [] Mother returned to Charleroi, Pennsylvania. [] Mother filed a Protection from Abuse Petition [(PFA)] on July 13, 2016 against [] Father, alleging that he was harassing her by phoning her at least 35 times from Colorado and threatening to kill her for leaving. The [c]ourt took judicial notice that the PFA (Case No. 2016-4125) was served on Father by a Deputy Sheriff in Colorado on August 15, 2016. The PFA was granted and Father was prohibited from having contact with [] Mother. [] Father was provided partial physical custody/visitation and allowed to Skype with [C]hild three nights a week and communicate through [] Father's grandmother. Thereafter, [] Father Skyped with [C]hild, who was then two years

old. After Skyping a few times, [] Father decided to end that avenue of communication and deleted his Skype account because he contended that the sessions always ended in arguments between [] Father and Mother. [] Father sent Mother an e-mail telling her he was deleting Skype and September of 2016 was the last time Father saw [C]hild. Around that same time, Father also returned to this area from Denver and was living with his grandmother in Monessen. He had criminal charges lodged against him in Colorado. He was detained here in Pennsylvania on a Colorado warrant and was extradited to Colorado to face felony drug charges. He was in jail in Colorado for a month and a half and was released in June of 2017. He returned to Pennsylvania; he had to return to Colorado to resolve his criminal case and is currently on parole and compliant.

Between September of 2016 and September of 2017, [] Father made no effort to contact his son. He contacted Attorney Peter Daley in September of 2017 to seek custody or visitation with his son. He did not know Mother's address. At the time of the PFA and later in 2016, Mother blocked Father from her cell phone, her Facebook account and her Instagram account. Father knew her e-mail address and the name and address of her employer. He knew where her mother and grandmother lived. Father's complaint for custody was filed in Westmoreland County on January 22, 2018. The case was subsequently transferred to Washington County on April 13, 2018 and docketed at 2018-2301. Mother was not served until after the transfer.

Trial Court Opinion (TCO), 8/10/18, at 1-3 (citations to record omitted).

Mother filed the termination petition on March 1, 2018. Mother and Father both attended the May 4, 2018 termination hearing with counsel. Child was also represented by counsel, who was also the guardian ad litem (GAL). The court issued its memorandum order on May 25, 2018, granting Mother's petition pursuant to 23 Pa.C.S. § 2511(a)(1) and (b). In its opinion, the court set forth additional findings, including the fact that Father had no contact with nor had he provided for Child since September of 2016. The court found

Father's assertion that he tried to send gifts to Child not credible. This determination was made by the court because Father could have emailed Mother informing her that he was leaving gifts for Child at the home of Mother's grandmother. The court further noted that although Father enlisted the services of an attorney in September of 2017, a complaint for custody was not filed until January 2018. Although the court recognized that obstacles were placed in Father's path, the court found that Father's contact with an attorney took place only after a full year of doing nothing. Even then, four months passed before the custody complaint was filed in the wrong county. Additionally, the court found that at the time of the hearing, Father had not seen or talked with Child for two years, one-half of Child's life. As for Child's relationship with Stepfather, the court found that they had a good relationship, with Stepfather performing the role of parent to Child. The GAL confirmed Child's good home life, and expressed that no bond existed between Child and Father. Finally, the trial court explained that at the beginning of the hearing Mother's attorney showed the court a document entitled a Notice of Intention to Adopt, signed by Stepfather on May 4, 2018, although it was not filed with the court until August 10, 2018.

Following the court's May 25, 2018 order terminating Father's parental rights, Father filed a timely appeal and subsequently filed a statement of errors complained of on appeal. In his brief, Father sets forth the following six issues for our review:

1. Whether the [t]rial [c]ourt abused its discretion by terminating [] Father's parental rights based upon insufficient evidence?

2. Whether the [t]rial [c]ourt abused its discretion by capriciously disregarding [] Mother's efforts to obstruct [] Father's relationship with the minor [C]hild?

3. Whether the [t]rial [c]ourt abused its discretion by finding that [] Father had not exercised reasonable firmness in overcoming the efforts of [] Mother to obstruct his relationship with his [Child] when it is undisputed that [] Father hired an attorney to pursue custody and had filed a [c]ustody [c]omplaint in an effort to maintain his relationship with the minor [C]hild?

4. Whether the [t]rial [c]ourt erred in ruling [] Father did not have a bond with the minor?

5. Whether the [t]rial [c]ourt abused its discretion when it relied on insufficient evidentiary support in finding that the termination of [] Father's rights was in the [C]hild's best interest?

6. Whether the [t]rial [c]ourt abused its discretion when it relied on insufficient evidentiary support to determine that [S]tep-father had a present intention to adopt the minor [C]hild without hearing testimony from the prospective adoptive father?

Father's brief at 4-5.

Appellate review of termination of parental rights cases implicate the following principles:

> In cases involving termination of parental rights: "our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child."

In re I.J., 972 A.2d 5, 8 (Pa. Super. 2009) (quoting In re S.D.T., Jr., 934 A.2d 703 (Pa. Super. 2007), appeal denied, 597 Pa. 68 950 A.2d 270 (2008)).

- 4 -

> Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. … We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

In re B.L.W., 843 A.2d 380, 383 (Pa. Super. 2004) (en banc), appeal denied, 581 Pa. 668, 863 A.2d 1141 (2004) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

In re Adoption of A.C.H., 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations and quotation marks omitted).

In re Z.P., 994 A.2d 1108, 1115-16 (Pa. Super. 2010).

We are guided further by the following: Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511, other citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. R.N.J., 985 A.2d 273, 276 (Pa. Super. 2009). However, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. In re B.L.W., 843 A.2d at 384.

With regard to Section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In In re C.M.S., 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. Id. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. In re K.Z.S., 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. Id. at 763.

In re Adoption of J.M., 991 A.2d 321, 324 (Pa. Super. 2010).

As noted above, the trial court terminated Father's parental rights pursuant to section 2511(a)(1) and (b), which provide:

> (a) General Rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> * * *
>
> (b) Other considerations. The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

In In re Z.P., 994 A.2d 1108 (Pa. Super. 2010), this Court provided direction relating to what considerations need to be addressed when reviewing a trial court's decision to terminate parental rights under various subsections of 2511(a). Specifically, relating to subsection (a)(1), the Z.P. Court stated:

> A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. In re C.S., [761 A.2d 1197 (Pa. Super. 2000)]. The court should consider the entire background of the case and not simply:
>
> > mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his ... parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

> In re B.,N.M., 856 A.2d 847, 855 (Pa. Super. 2004), appeal denied, 582 Pa. 718, 872 A.2d 1200 (2005) (citing In re D.J.S., 737 A.2d 283 (Pa. Super. 1999)).

In re Z.P., 994 A.2d at 1117 (emphasis in original).

In the argument portion of Father's brief, he discusses evidence addressing the first three issues together. He claims that the trial court placed emphasis on the evidence relating to what occurred in 2016, rather than on the previous six months prior to the filing of Mother's termination petition. He also asserts his fear of contacting Mother because the PFA was in place and explained his stopping of the Skype visits due to the arguments that ensued between him and Mother. Essentially, Father contends that he tried to maintain his relationship with Child despite the obstacles placed in his path by Mother, again emphasizing the six-month period preceding the filing of the termination petition. Father also suggests that his email messages to Mother described his love for Child and how much he wanted to be a part of Child's life despite the difficulties he dealt with relating to his criminal case.

Father recognized that "parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of [his] ability, even in difficult circumstances." Father's brief at 19 (quoting In re B.,N.M., 856 A.2d at 855). However, instead of Mother offering help, Father claims she did all she could to prevent any communication between Child and Father. He then described his attempts to overcome the obstacles, such as

trying to locate Mother by going to Mother's grandmother to find out where Mother was living. The main point that Father makes in this regard is that the court gave Mother a pass as to her obstructive behavior. Father also notes his hiring an attorney to pursue custody, and claims that the delay in filing of the custody complaint was not his fault. Rather, he mentions his lack of funds to hire the attorney in the first place and the difficulty he had in serving the custody complaint because he did not know Mother's address and had no way to communicate with her. He does acknowledge that he informed his attorney where he thought Mother worked so that she could be served with the custody complaint at that location. However, he admits that Mother was only served following the transfer of the case to Washington County.

In response to Father's first issue concerning the sufficiency of the evidence, the trial court stated its findings and conclusions, based on the evidence presented by the parties. Specifically, the court's opinion provides:

> It is unrefuted that in the six[-]month period before the filing of the petition, [] Father had no contact at all and was not performing any parental duties during that period. He provided no financial support and had no communication at all. The conduct evidences a settled purpose to relinquish his parental rights. Strictly construing that provision, [Father], by [his] own testimony that he hasn't seen or provided anything to [C]hild since September of 2016, established the elements of 2511(a)(1). However, the [c]ourt must not just mechanically apply the six-month statutory provision; the [c]ourt must look at the circumstances of the case and the explanations offered by the parent for his conduct. In Re: B.,N.M., supra.
>
> Therefore, the inquiry shifted to [] Father's explanation for his absence in his [C]hild's life. [] Father did not know where [Mother] lived; that is unrefuted. But that alone is not sufficient.

- 9 -

Scrutiny must also be made as to the efforts Father made to locate [] Mother, [and] the efforts [] Father made to obtain and maintain a place of importance in [C]hild's life. Father clearly knew [] Mother was in the Charleroi area – he last saw her in September of 2016 in Walmart. He knew where her mother lived and her mother's phone number. He knew her e-mail address. Importantly, he knew where she worked. She worked at a nursing facility in Canonsburg, Pennsylvania when they were together and when she returned from Colorado she was able to return to her employment and he knew that. Mother did not appear to be hiding from [] Father or keeping her whereabouts a secret. When they were together, they moved frequently and that pattern apparently continued with Mother. While Father said he contacted Mother's grandmother and she told him that [] Mother doesn't want anything to do with him, he obviously knew the grandmother's residence. Father knew Mother's e-mail address. He said he tried to send his son gifts. The [c]ourt did not find Father's explanation credible. He could have easily e-mailed her telling her that he was delivering presents or financial support for his son by dropping it off at her grandmother's house.

In addition to saying he did not know where Mother was, he also stated he was worried that he had a PFA against him. He was served with the temporary Order while he was in Colorado. When he returned, he made no effort to determine the status of the PFA. Father sought the services of Attorney Daley in September of 2017 but didn't file the Complaint for four months. Father offered no explanation for the delay, and Mr. Daley mentioned money as a reason. Father did not seek the services of legal aid or proceed pro se if he was unable to afford private counsel. The [c]ourt's conclusion was [that,] while obstacles were clearly in his path in his efforts to connect with his [C]hild, [] Father showed little resoluteness in overcoming those obstacles. [C]hild is entitled to more, to someone who will exert himself to maintain a place of importance in his life.

TCO at 5-6 (citations to the record omitted).

Additionally, with regard to Father's second and third issues considering whether Mother obstructed Father's relationship with Child, the court acknowledged that there were obstacles. However, the court emphasized

Father's response, noting that "the only action [he] undertook, after a full year of doing absolutely nothing, was contacting an attorney who, after four months, filed a custody complaint in the wrong county, still not determining Mother's address and not being able to do anything with that complaint for at least three months after filing." Id. at 7. The trial court also pointed out that it was not the attorney's duty, but Father's, to locate Mother.

Thus, the court, based on its findings and credibility determinations, concluded that Father refused or failed to perform his parental duties for a period of at least six months prior to the filing of the petition to terminate his parental rights. Father's entire argument is essentially an attack on the trial court's findings and credibility determinations. However, after our thorough review of the record, we determine that the record supports the court's findings and it did not abuse its discretion in arriving at its conclusion. Therefore, Father is not entitled to relief.

The main point of Father's fourth issue centers on the court's finding that Father did not have a bond with Child, which is a part of the Section 2511(b) analysis. Father cites his actions during the first two years of Child's life when the parties lived together and again his attempts at contact with Child in 2017 up to the time of the termination hearing. Most of Father's actions detailed in his brief refer to Facebook and email messages to Mother requesting time to see Child and his expressions of love for Child. Again, Father is attempting to refute the trial court's findings and its conclusion that

Mother met her burden of proof that no bond existed. Specifically, the court stated:

> At the time of the hearing, [] Father had not seen or talked with his son for two (2) years, half of [C]hild's life. [] Mother stated that [C]hild would not recognize or remember [] Father. [C]hild's attorney/GAL stated that, in his opinion, [] Father had no bond with [C]hild. The evidence supported the [c]ourt's finding. Because there was no father-son bond in existence at the time of the hearing, the [c]ourt properly found that no adverse effect would occur if the relationship between [] Father and [C]hild was terminated.

Id. at 8 (citations to the record omitted). We agree and again note that the court's findings and conclusion are supported by the evidence of record.

Father addresses his last two issues together. They concern whether the court erred by determining whether the termination of Father's rights was in Child's best interests and whether there was sufficient evidence to show that Stepfather had the present intent to adopt Child without Stepfather's giving testimony at the hearing. Father contends that Mother was not married to Stepfather at the time she filed the termination petition. Moreover, he contends that Stepfather's notice of intent to adopt was not made a part of the record until August 10, 2018, even though the instant appeal from the termination order had already been filed on June 21, 2018. Essentially, Father argues that without evidence of Stepfather's intent to adopt or his testimony about the relationship between him and Child, the court erred in concluding that the termination of Father's parental rights was in Child's best interests.

In response to these arguments, the court stated:

At the time of the hearing, no bond was in existence between the Father and [C]hild. [C]hild's [S]tepfather, who desires to adopt him, has a close relationship with [C]hild. [] Mother and her husband live together and appear to have a good relationship with each other. [S]tepfather is performing the role of a parent to [C]hild. The [GAL] stated that [C]hild's home life was good and that [Child] had no bond with [] Father. The evidence was sufficient to establish, after the finding that one or more grounds existed to terminate [] Father's rights, that the termination was in [C]hild's best interest.

. . .

The attorney for [Mother] indicated to the [c]ourt, at the onset of the hearing, that [S]tepfather, [N.L.], intended to adopt and that he signed a Notice of Intention to Adopt and showed that document to the [c]ourt. The [c]ourt notes that a Report of Intent to Adopt was signed by [N.L.] on May 4, 2018 but was not filed with the Orphans' Court until August 10, 2018.

TCO at 8-9 (citations to record omitted).

Section 2512 of the Adoption Act, 23 Pa.C.S. § 2512, governs "who may bring a petition to terminate parental rights and what the petition must contain...." In re Adoption of M.R.D., 128 A.3d 1249, 1259 (Pa. Super. 2015).

"If the petitioner is not an agency, then the petition must include 'an averment that an adoption is presently contemplated or that a person with a present intention to adopt exists.'" In re E.M.I., [57 A.3d 1278,] 1286 [(Pa. Super. 2012)] (quoting In re Adoption of J.F.D., 782 A.2d 564, 567 (Pa. Super. 2001). As a general rule, however, the biological parent who files a petition to terminate the parental rights of the other biological parent, with the intent to retain custody or physical care of the child, does not have to file an accompanying report of intention to adopt. Id. at 1286. See also 23 Pa.C.S.[] § 2631(c) (stating: "No report shall be required when the child is the child, grandchild, stepchild, brother or sister of the whole or half blood, or niece or nephew by blood, marriage or adoption of the person receiving or retaining custody or physical care").

A termination petition of one biological parent against the other, per Section 2512(a)(1), is cognizable only if the averred adoption is foreseeable. 23 Pa.C.S.[] § 2512(b); In re E.M.I., supra at 1286. See also In re B.E., 474 Pa. 139, 142, 377 A.2d 153, 154 (1977) (stating plan for adoption is required, when one biological parent seeks involuntary termination of parental rights of other biological parent). Although a petition might satisfy the statutory requirements for termination of parental rights, a court still cannot grant the petition without a corresponding plan for adoption of the child. In re Adoption of L.J.B., [] 18 A.3d [1098,] 1107 [(Pa. 2011)] (reversing involuntary termination of mother's parental rights, where termination decree was entered to make way for stepmother's adoption of child, in light of new evidence that stepmother no longer wanted to adopt child). A contemplated adoption is required in this context because "the purpose of involuntary termination of parental rights is to dispense with the need for parental consent to an adoption when, by choice or neglect, a parent has failed to meet the continuing needs of the child. Id. at 229-30, 18 A.3d at 1108.

Id. at 1260.

As noted in the trial court's opinion, Stepfather's signed Notice of Intent to Adopt was provided to it for inspection at the beginning of the termination hearing. Moreover, Mother's petition included an averment that Stepfather wished to adopt Child. Additionally, Stepfather's attendance at the hearing evinced his support for Mother's petition to terminate Father's parental rights and his intent to adopt Child. It is troubling that the document itself was not officially filed until August 10, 2018, but that delay does not nullify its presentation to the court, which then had the information necessary to conclude that Child's adoption by Stepfather was intended. Stepfather's intent and the testimony provided by Mother and the GAL, relating to Stepfather's and Child's relationship, supported the court's conclusion that the termination of Father's parental rights would be in Child's best interests. Therefore, we

- 14 -

again conclude that the trial court did not err in this regard.  Father has not convinced us otherwise.

Accordingly, we conclude that the court correctly terminated Father's parental rights to Child, which allows Stepfather's intention to adopt to proceed, an action that serves Child's best interests.  Therefore, we affirm the May 25, 2018 order granting Mother's termination petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/1/2019